**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| STANLEY CLIFF SMITH, | : | |
| | : | |
| Petitioner, | : | Civ. No. 20-202 (GC) |
| | : | |
| v. | : | |
| | : | |
| ATTORNEY GENERAL OF THE STATE | : | **OPINION** |
| OF NEW JERSEY, | : | |
| | : | |
| Respondent. | : | |

**CASTNER, District Judge**

### I.     INTRODUCTION

Petitioner, Stanley Cliff Smith ("Petitioner" or "Smith"), is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See* ECF 3). For the following reasons, Petitioner's habeas petition is denied and a certificate of appealability shall not issue.

### II.    FACTUAL AND PROCEDURAL BACKGROUND

Petitioner's convictions arise from the shooting death of Robert Priester in his BMW-SUV on December 31, 2001, in Trenton, New Jersey outside a delicatessen. The underlying factual background from the investigation into this murder is taken from the New Jersey Supreme Court's decision on Petitioner's direct appeal as follows:

> Robert Priester was a drug dealer in Trenton and was known by the street name Ra [ ] Ra. Priester had been involved in a dispute with another drug dealer, Jerome Roberts, known by the street name Righteous. Defendant [Smith], known by the street name Butter, was a friend of Roberts and a partner with him, both in the drug trade and in a Trenton clothing store, Blikka. The State's theory at trial was that defendant [Smith] and Roberts, seeking revenge on

Priester, arranged for two other men, Andre Bellinger and Khalif Johnson, to shoot him.

Detective Patrick Holt of the Ewing police force was the on-call detective when Priester was shot to death. He was dispatched to the scene and became the lead detective on the case. Holt spoke to Priester's father and sister shortly after the murder. Both told him of the dispute between Priester and Roberts. They related that months earlier, Priester had gone to New York City with a large sum of cash to restock his narcotics inventory but was unable to complete his purchase because he was robbed at gunpoint. Priester believed that Roberts had arranged the robbery. Holt learned that Priester and Roberts had since on several occasions exchanged gunfire. He also learned that several weeks before Priester's murder, Roberts was treated at a local hospital after having been shot by an unknown assailant.

In addition to speaking with Priester's father and sister, Holt also spoke to Priester's girlfriend. He learned from her that when Priester left on the morning of his murder, he took his ring, watch, and cell phone. She said she spoke to him on the cell phone shortly before he was murdered. Priester's ring, watch, and cell phone could not be found after his death. She confirmed the information about the dispute between Priester and Roberts as did several of Priester's associates in his drug trade. Based on this information, Holt viewed Roberts as a likely suspect in Priester's death.

An autopsy on Priester was performed the next day. Four .38 caliber bullets were recovered during that autopsy. An examination of the bullets showed that each had been fired from the same weapon, which was identified preliminarily as possibly a Smith and Wesson .38 or .357 caliber.

On January 4, 2002, Holt spoke to Larry Dickerson, who had been arrested for shoplifting, but volunteered that he had information about Priester's murder. Dickerson first told Holt that he had seen someone shoot Priester through the car's front windshield and then run away. Holt knew this statement could not be correct, and he showed Dickerson a newspaper picture of Priester's car, with its front windshield intact and its driver's side window shattered. Dickerson then revised his story and said he saw a black male, dressed in black clothes, run up to Priester's car from the rear with a silver-colored gun and fire into the car and then flee. Holt considered the reference to a silver-colored gun to be significant because the police had received an anonymous phone call reporting the shooting, which had contained a reference to a silver-colored

2

gun, but that detail had not been reported publicly. Dickerson said he did not know the shooter. Holt asked if he would be willing to take a polygraph, and Dickerson agreed. Holt confronted Dickerson with the results of the polygraph, which indicated he was being deceptive with respect to whether he could identify the shooter. Dickerson then told Holt that he recognized Roberts as the shooter and provided a written statement to that effect.

Based on that identification, an arrest warrant for Roberts issued on the following day, January 5, and Roberts was taken into custody. The police also obtained a search warrant for Blikka and for Roberts's car. A subsequent search of the vehicle turned up an address book in which "Butter" and a telephone number were written on the first page. It also turned up a .9 millimeter handgun, which could not be linked to the Priester murder. The search of the store did not turn up anything of immediate evidential value.

Roberts admitted to the police that he and Priester had been engaged in a running dispute but insisted that at the time of the shooting he had been at Mason's Barber Shop (Mason's) several blocks from the M & M deli. Roberts supplied the names of several individuals, including employees of the shop, who could confirm his presence there. Roberts said he learned of the shooting at approximately 5:50 p.m. when a man he identified as Big D came into Mason's and said Priester had been shot. Roberts said that while he was at the barber shop, he placed and received several calls on his cell phone. He said that when he left Mason's, he went out drinking with several friends in Philadelphia.

While Roberts was in custody, he placed a telephone call to his fiancée, Kelly White. That call, in accordance with standard protocol, was monitored. Roberts told her, "They know everything, nothing is a secret. These people know from the time I came off the porch, they know the shit that went on this summer." He asked her to help track down people who could confirm his presence at the barber shop and to tell "Butter" that he needed money and an attorney.

On January 7, Lieutenant Pieslak of the Ewing police told Detective Holt that he had received a telephone call from a man who identified himself as Stanley Smith, who said the police had the wrong man in custody and that Roberts was not the shooter. The lieutenant told Holt the caller agreed to come to headquarters to give more information.

Police contacted the individuals that Roberts had identified as alibi witnesses, and they all confirmed that Roberts had been at Mason's when Priester was shot to death. They also described his clothing on that date, which did not accord with the description given by Dickerson or the anonymous caller of the clothing worn by the shooter. The stories of these alibi witnesses, however, were inconsistent with respect to what Roberts had done after leaving the barber shop. Roberts, for instance, said he left the barber shop at approximately 8:00 p.m. with several friends, including Alphonso Wiggins. Wiggins, in contrast, said he left the barber shop alone at approximately 5:45 p.m. Trecia Taylor said she picked up Roberts at the barber shop sometime after 6:00 p.m. and that the two had gone to Philadelphia together and around 10:30 p.m. returned to her home to spend the night. Albert Barnes, on the other hand, said he picked up Roberts at the barber shop shortly after 6:00 p.m., and the two men, with other friends, went to Philadelphia, where they stayed until early the next morning.

On January 14, 2002, Holt applied for a communications data warrant to obtain the cell phone records of Roberts and Priester. In his affidavit in support of the warrant application, Holt referred to Dickerson's identification of Roberts as the shooter and his description of the shooter as wearing a black hat, black pants, black jacket, and a black ski mask. Holt noted in his affidavit Dickerson's statement that he had known Roberts for approximately ten years and that he was certain Roberts was the shooter. He also noted that Trecia Taylor had told Holt that she spoke to Roberts on his cell phone several times, once to tell him that Priester had been shot and that Roberts had responded that he already knew that because someone had walked into the barber shop to announce the killing.

Holt did not include in his affidavit that Dickerson had provided two earlier conflicting stories about the shooting. Nor did he include in his affidavit that individuals had confirmed Roberts's presence at the barber shop at the time of the shooting or that their description of Roberts's clothing that evening did not comport with the description provided either by Dickerson or the anonymous caller.

Based on that affidavit, the communications data warrant was issued, and the police obtained Roberts's telephone records on or about January 21. Holt was not actively working on the case when the records were received, however, because he went on paternity leave on January 18. Officers who reviewed the records in Holt's absence noted there were a number of calls between Roberts's cell phone and two other numbers in the time immediately before and after the shooting.

4

The warrant that had issued permitting the release of Roberts's cell phone information allowed the police to obtain subscriber information for the numbers contained in those records. Accordingly, the police faxed separate requests to the service providers for the subscriber information for those two numbers. The cover sheet for the request for one of the numbers simply referred to subscriber information. The service provider, however, supplied not only the subscriber information, which linked that number to defendant [Smith], but also forwarded erroneously to the police the toll billing information for that number. The cover sheet for the request for the second number asked for the toll billing information for that number, as well as the subscriber information. The service provider, on receipt of this request, forwarded not only the subscriber information, identifying the telephone number as assigned to Andre Bellinger, but the toll billing information as well. An examination of those telephone records showed an extensive number of phone calls between defendant [Smith] and Bellinger on December 31, as well as calls with Roberts.

Defendant [Smith] was arrested in early February on unrelated drug charges. Based on Lieutenant Pieslak having told Holt that he had received a phone call from someone who said he was Stanley Smith and that Roberts had not shot Priester, Holt (who had returned from paternity leave on February 6) arranged for defendant [Smith] to be produced for an interview at the Mercer County Prosecutor's Office on February 11. In that interview, defendant [Smith] told Holt that Roberts had been at the barber shop when Priester was shot and said that he had later accompanied Roberts for a night of drinking. Detective Holt then asked defendant [Smith] if he knew who Andre Bellinger was. Holt said defendant's [Smith's] eyes lit, that he looked startled, and said he wanted to consult with an attorney. The interview ended at that point.

On February 10, the day before Holt interviewed defendant [Smith], Khalif Johnson was arrested in Monmouth County on an unrelated charge of attempted murder. In connection with Johnson's arrest, a Smith and Wesson .357 magnum was recovered and sent for ballistics analysis. The results of that analysis, received several weeks later, determined the .357 magnum was the gun used to murder Priester.

Detective Holt wanted to find out what connection Bellinger had, if any, to the events in Trenton but was having trouble locating him. On February 16, Bellinger was arrested for a parole violation, and his parole officer notified Detective Holt. Holt interviewed

Bellinger on February 17, in the presence of Bellinger's attorney. Bellinger originally said he spent December 31 in Long Branch but retreated from that position when advised that his phone records did not support his statement. Bellinger then said he went to Trenton on December 31 to sell some narcotics that he had been unable to market in his home territory in Long Branch. He said his friend Khalif Johnson drove him to Trenton and that Smith had led them to several locations in Trenton to make a drug deal, but his efforts were unsuccessful because of the poor quality of the goods. He said Khalif was not involved directly in the effort to sell the drugs in Trenton but had agreed to drive him to Trenton because he and Khalif had been best friends since they were five years old, had both been released recently from prison, and wanted to spend some time together. He said an unidentified man had been in defendant's [Smith's] car and had shot someone who was sitting in a car outside a deli.

Bellinger agreed to take a polygraph exam, which he failed. On February 21, Detective Holt interviewed him for a second time, again with his attorney present. Bellinger again recounted that Khalif Johnson drove him to Trenton so he could sell drugs and that defendant [Smith] took him to several potential purchasers. He said defendant [Smith] had told him in phone conversations before the trip to Trenton that he and Roberts had a dispute with Priester, who was "stepping on their toes," and that he had, in turn, told Johnson of the feud. Bellinger said defendant [Smith] went into more detail with respect to this dispute while they were together in Trenton. He said defendant [Smith] told him that Roberts had been wounded by gunfire, and defendant [Smith] and Roberts believed Priester was responsible.

Bellinger said that he and Johnson followed defendant [Smith] as defendant [Smith] led them to various potential sales areas. He said that another man, who he was unable to identify, was a passenger in defendant's [Smith's] car. Bellinger said that when his marketing efforts proved unsuccessful, defendant [Smith] led them to Roberts's home. Bellinger and defendant [Smith] went into the house, leaving Johnson and the other man outside. Bellinger said the three men discussed the ongoing dispute between Roberts and Smith on the one hand and Priester on the other, including their belief that Priester was responsible for the recent shooting incident in which Roberts had been wounded. They told Bellinger they wanted "some work put in" and asked if he were interested. He said he agreed, and they settled on a price of $2000. Roberts produced a new .357 magnum, still in its box, and gave it to Bellinger, who stuck it in his waist band. Bellinger said he went outside and outlined

the matter to Johnson, who agreed to help. It was further agreed that after the shooting, defendant [Smith] would lead Johnson and Bellinger, who were unfamiliar with the Trenton streets, to I–95 so they could return to Long Branch. In this second statement, Bellinger said they found Priester sitting in his car, that Bellinger ran up and fired the gun through the driver's window and ran back, leaving the gun in Smith's car. After Bellinger said that he shot Priester, Holt again spoke to Dickerson. Holt said Dickerson continued to maintain that he had seen Roberts shoot Priester.

Approximately two weeks later, on March 7, Detective Holt received a ballistics report indicating that the gun recovered in connection with the arrest of Khalif Johnson in Asbury Park on February 10 was indeed the gun used to murder Priester. Holt thus learned that Bellinger's second statement, in which he said he left the gun in defendant's [Smith's] car, was not entirely truthful.

The following day, on 'arch 8, Holt interviewed Bellinger a third time. Bellinger was again accompanied by his attorney. Holt pointed out to Bellinger that the recovery of the gun in Monmouth County demonstrated that Bellinger's statement was not completely accurate. After conferring with his attorney, Bellinger agreed to provide a complete account of what occurred on December 31. He again related the meeting between himself, Roberts, and defendant [Smith] after he was unsuccessful in selling his drugs, the agreement to shoot Priester for $2000, and Roberts providing the gun. He again said that Johnson had agreed to help but in his third statement, Bellinger claimed that Johnson said he would shoot Priester rather than Bellinger because Johnson had more experience with guns. Bellinger said that he had taken responsibility for the shooting in his second statement because he knew that Johnson was facing a charge of attempted murder in Monmouth County, and he wanted to save his friend from spending too much time in prison. In this third statement, Bellinger said that three cars took off in search of Priester, one driven by Roberts, one driven by Smith, and one driven by Johnson. He said that as they drove around Trenton searching for Priester, he, defendant [Smith], and Roberts engaged in a number of phone calls, including several three-way calls.

During these calls, Bellinger continued, there was discussion of the fact that Roberts would be at the barber shop at the time of the shooting. At some point, it was decided it would be more efficient for Bellinger and Johnson to get in Smith's car as they looked for Priester. They eventually spotted Priester in the deli parking lot. Bellinger and Johnson returned to pick up Johnson's car, and Smith led them back to the deli. They parked the two cars a short distance

from Priester. Bellinger said Johnson ran up, shot Priester, and got back into Johnson's car. Smith led the two out of Trenton to I–95. Bellinger said that Johnson told him on the drive back to Long Branch that he would dispose of the gun.

Three days later, on March 11, Detective Holt interviewed Khalif Johnson at the Monmouth County Prosecutor's Office in connection with the Priester shooting. Holt outlined what his investigation had developed to that point, including that Bellinger had identified him as the shooter. Johnson said he wanted to speak with his father before proceeding, and arrangements were made for his father to come to the prosecutor's office. Johnson was given an opportunity to confer with his father and, after doing so, said he wanted to have an attorney present before answering any further questions.

The meeting ended at that point but resumed on March 26, with Johnson's attorney present. Johnson related the events of December 31 along the same lines as had Bellinger but said he was supposed to receive $3000 for his participation. He said he decided to shoot Priester because Bellinger had no prior experience in that field, and he was concerned that Bellinger would not be successful. He said he had disposed of the shell casings in a sewer drain and took the police to the site, but a search for the casings was unsuccessful. After completing his statement, Johnson selected defendant's [Smith's] picture from a photo array. The police obtained a search warrant for Johnson's car, and a search of the vehicle turned up a jacket that matched the description of the shooter's jacket that had been supplied by the anonymous caller, as well as a ski cap and skull cap.

Based on these statements, criminal complaints were prepared charging defendant [Smith] with murder, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. These complaints were served on defendant [Smith] on April 1, at which time defendant [Smith] remained in custody on the unrelated charges for which he had been arrested in early February.

Robert Esposito occupied the cell next to defendant [Smith] at the Central Assignment and Reception Facility, where they were both housed. Esposito testified that he knew defendant's [Smith's] brother because the two had spent time together in a half-way house in Trenton and that he and defendant [Smith] spoke regularly while they occupied adjoining cells. Esposito testified that defendant [Smith] appeared not at all concerned after being served with these charges and described them with a barnyard epithet. According to Esposito, defendant [Smith] said he was not concerned about the

charges because he did not shoot anyone. Esposito said that over the next several days, defendant [Smith] provided more details, saying that he gave a gun to a friend to shoot someone that defendant [Smith] had a beef with and that defendant [Smith] had been down the block when his friend shot the victim, who was sitting in a gray BMW. Defendant [Smith] said the gun would not be traced because it was a revolver, which did not eject any shell casings.

On April 1, with his investigation basically completed, Holt, as the lead detective, reviewed the file to organize its contents. In doing so, he realized for the first time that the police had received the toll billing records for defendant's [Smith's] and Bellinger's cell phones without having sought and obtained an appropriate communications data warrant. He consulted with attorneys in the prosecutor's office, seeking advice as to how to proceed. He was told that he should prepare applications for communications data warrants for these phones, but to include within the supporting affidavit only information that he had as of the time the toll billing records had been received. Based on that advice, Holt prepared an affidavit that mirrored in large part the original affidavit he had submitted in support of his request for a communications data warrant for Roberts's cell phone, including in this affidavit Dickerson's statement that Roberts was the shooter. When Holt submitted this second affidavit, however, he knew, based on the statements of Bellinger and Johnson, that Roberts was in fact not the shooter.

Based on this affidavit, communications data warrants were issued for both cell phone numbers.

*State v. Smith*, 54 A.3d 772, 777–82 (N.J. 2012). During Petitioner's post-conviction relief

("PCR") proceedings, the New Jersey Superior Court, Law Division expressly noted the testimony

of four witnesses at Petitioner's trial that implicated Petitioner in the murder; namely Bellinger,

Johnson, Esposito and Holt. That Court recited their relevant trial testimony as follows:

A. Andre Bellinger

Andre Bellinger testified that he was headed to Trenton on December 31, 2001 to meet with Petitioner (aka, "Butter") to sell crack cocaine. He had been introduced to Petitioner earlier in the year and had visited him in Trenton, New Jersey on a previous occasion. According to Bellinger, Petitioner intended to show him around the city and introduce him to local dealers.

Khalif Johnson drove Bellinger to Trenton that day. Bellinger described Johnson as his "best friend," who he has known for over twenty-five years. He testified that they arrived in Trenton at around 1:30 p.m. Bellinger contacted Petitioner on his cell phone, and Petitioner provided directions to a meeting place. The three men then drove around the city in separate cars to sell the drugs. Petitioner was driving a rented car at the time, a Dodge Intrepid, while Bellinger and Johnson were in Johnson's Pontiac Grand Am. The group visited three or four locations in Trenton, but they were unable to sell the drugs because of their low quality.

After they failed to complete any drug sales, Bellinger testified that they drove to Jerome Roberts'[s] (aka. "Righteous") house. Bellinger knew Roberts because he had met him during his prior visit to Trenton. Bellinger, Roberts and Petitioner entered the house and went upstairs to talk while Johnson waited on the lower level. Bellinger stated that Roberts wanted "some work put in" to resolve a conflict he had with Robert Priester (aka. "Ra Ra"). Petitioner had mentioned the conflict to Bellinger over the phone three weeks earlier and indicated that Priester had shot at Roberts. Bellinger claimed that Roberts initially intended to "beat up" Priester as part of a robbery, but ultimately decided that he "wanted the guy dead." Bellinger was offered $2,000 to shoot Priester, and he did not ask for more because "it wasn't about . . . the money." Roberts gave Bellinger a .357 revolver that was "brand new out of the box." Bellinger testified that he tucked the gun into his pants and walked out to describe the plan to Johnson. Johnson and Bellinger drove in Johnson's vehicle and followed Petitioner's Intrepid to find Priester. Roberts assisted with the search for a period of time, but he eventually separated from the others. Part of the arrangement was for Roberts to be somewhere public, like a barbershop, to establish an alibi.

Bellinger stated that they communicated by cell phone as they searched for Priester. Johnson volunteered to be the shooter because he had "a lot of experience with it." When Priester was spotted, Bellinger drove Johnson's vehicle to M&M Deli. They found Priester parked outside in his silver BMW. Johnson exited the car, approached Priester, and shot him three or four times. Bellinger testified that the shooting occurred at around 5:00 p.m. and "it was a little dark." Johnson ran back to his car, and they called Petitioner. They met up with Petitioner, who led them out of Trenton to I-95. Bellinger stated that they returned to Monmouth County and went their separate ways.

Bellinger was arrested on a parole violation after the shooting and was interviewed by Detective Holt over the course of several days. He testified that he made a number of inconsistent statements to Detective Holt. Bellinger stated that he lied to Detective Holt in their first meeting and said he was not involved in the shooting. After being confronted with phone records that documented calls with Roberts and Petitioner, he supplied Detective Holt with information about the murder. Bellinger testified that he provided three different versions of the events that occurred on the day of the shooting. Bellinger told Detective Holt that an "unknown" male was the shooter. He later revised his story and claimed that he was the shooter. Bellinger altered his account for a third time and finally admitted that Johnson killed Priester. He testified that he was trying to protect Johnson because he had been charged with a separate shooting in Long Branch, and did not want to add to his prison time.

> BELLINGER: I was lying at first not to implicate anyone. I believe I told him I had a car accident with Ra Ra, and I got out of it and I shot him. So I didn't – wouldn't implicate anyone else. I didn't want to be set up as a stool-pigeon, so I didn't.

On cross-examination, defense counsel confronted Bellinger with the false statements that he made to Detective Holt. He also identified inconsistencies between his statements to Detective Holt and his testimony on direct examination. For example, defense counsel pointed out that Bellinger's direct testimony concerning the time of his arrival in Trenton contradicted a statement that he had provided to Detective Holt. He inquired:

> DEFENSE COUNSEL: Do you remember in your statement back in 2002 saying that you got there around 11:30 in the morning?
> BELLINGER: Probably. I thought it was 11:30. Now, I thought it was either 11:30 or 1:30.
> DEFENSE COUNSEL: Well, I'm asking you now what's your last recollection as to when you got there that day?
> BELLINGER: Maybe in the morning 11:30. 11:30.
> DEFENSE COUNSEL: 11:30. So you were wrong when you testified that you got there in the afternoon on direct examination?
> BELLINGER: Been like almost five years ago. I knew it was in the morning.

To further impeach his credibility, defense counsel elicited his criminal history and the favorable terms of the plea agreement that he received for testifying against Petitioner. He also prompted Bellinger to admit that he conferred with Johnson after the murder to pin the blame on Petitioner and Roberts.

B. Khalif Johnson

Khalif Johnson was introduced to Petitioner shortly before the day of the shooting. Two weeks prior to December 31, 2001, Johnson spoke to Petitioner over the phone. Petitioner referred to himself as "Butter," and told him how he knew Bellinger. Petitioner said that his friend "Righteous" had been hospitalized after he was involved in a shooting with Priester.

On December 31, Bellinger asked Johnson to accompany him to Trenton to sell drugs. Johnson testified that he had met Bellinger when he was five years old and had grown up with him. Johnson agreed, and he drove Bellinger from Long Branch to Trenton. Johnson and Bellinger spoke to Petitioner over the phone and agreed to meet at a gas station. They arrived in Trenton at around 1:30 p.m. and rendezvoused with Petitioner. The three individuals traveled around Trenton in an attempt to sell crack cocaine, with Johnson and Bellinger following Petitioner's rental car, a "blue and green color" Intrepid. They were unable to sell the drugs and drove over to Robert's house.

Johnson testified that Bellinger and Petitioner went inside the house while he stayed with his car. When Bellinger returned, he displayed a handgun and stated he was "going to put some work in for Righteous and Butter, to shoot the guy that shot Righteous." Bellinger also informed him, "[T]he guy that shot him drove away in a gray BMW X5." Bellinger asked Johnson to assistant him. He indicated that he was doing Roberts a favor and they would pay Johnson $3,000.

The group left Roberts' house. Johnson testified that Petitioner, Bellinger, and Roberts held three-way cellphone calls to carry out the plan. Roberts intended to leave the area of the shooting so that he could be seen in a public place with multiple witnesses. During these discussions, Johnson decided to replace Bellinger as the shooter. Johnson concluded that Bellinger was not appropriate to shoot the victim because he was inexperienced and it might "drive him over the edge."

Once Priester's car was spotted, they followed it until he parked it

outside of a store.  Johnson testified that they found Priester just as the sun was going down, but he could not recall whether they arrived before 5:28 p.m.  Johnson stated that he exited his vehicle and jogged down the street.  He approached the BMW and shot Priester multiple times.  Johnson jumped back in the car with Bellinger, and they followed Petitioner's rental car away from the area.  Petitioner led them to I-95 because they were not familiar with Trenton.  Once Petitioner returned to Trenton, Bellinger, and Johnson went home to Long Branch.

Johnson testified that Bellinger and Petitioner made a number of cell phone calls after the shooting to discuss the victim's status.  Priester had been taken to the hospital, and they debated sending someone to assess his condition.  Meanwhile, Bellinger directed Johnson to dispose of the handgun.  He testified that he unloaded empty bullet shells in a plastic bag and threw them down a drain near his mother's house in Monmouth County.  Johnson, however, kept the gun.

Defense counsel confronted Johnson about the statements that he had made to Detective Holt.  He asked Johnson whether he reviewed Bellinger's statements before he provided his own account of the shooting to Detective Holt.  Johnson responded that he spoke to the Detective without reading Bellinger's statements, but eventually conceded that he was familiar with Bellinger's account.  Counsel also asked him whether Bellinger concocted a plan to blame Petitioner for the murder.  Johnson claimed that they never contemplated such a plan because they were confident that they would get away with it.

Defense counsel also questioned Johnson's claim that they met with drug dealers on the day of the shooting.  Counsel asked Johnson to identify the drug dealers, but Johnson could only reply that they were introduced to "several people" who were "all black men."  Johnson did not know the quantity of drugs or the amount of money that Bellinger was carrying.  He said that they did not bring a firearm because Petitioner planned to take them around the city.

Throughout the cross-examination, defense counsel pursued multiple lines of questioning concerning Johnson's compensation for the shooting.  Johnson stated that he told Bellinger that he wanted $3,000 for his involvement in the murder.  Johnson testified that he did not take any jewelry from the victim, and he never received a payment for carrying out the murder.  He did not ask Bellinger for the money after the shooting because Bellinger had been released from prison and needed the extra funds.

13

Defense counsel also questioned Johnson concerning his criminal history and his motivation to testify against Petitioner. He pointed to Johnson's record, which included multiple weapons offenses and attempted murder, and drew attention to his plea agreement with the State.

C. Robert Esposito

Robert Esposito testified that he met Petitioner through Petitioner's brother, Darryl Smith. Esposito and Darryl Smith resided together at Clinton House, which was a halfway house. Petitioner made several visits to see his brother at the facility, and Esposito had a chance to speak with Petitioner during some of these visits.

Esposito encountered Petitioner again when they occupied neighboring cells at Central Assignment and Reception Facility (CRAF). While they were incarcerated at CRAF, Petitioner told Esposito that he had been charged with "some murder and guns and stuff like that." Petitioner did not appear to be concerned about the charges and indicated that they were "BS." He gradually revealed details of the shooting over the course of several days. Esposito testified:

> Basically, he had a beef with somebody, and he was down the block and he gave a gun to his friend, a .357, and that the gun, he provided the gun because there was no – there would be no shells with a .357, and that he was down the block, and that his friend shot the guy in a car or something.

Petitioner stated that the victim's car was a gray BMW and that the gun shots had "bl[own] half of his face off." Petitioner was not worried about the gun being traced because it was a revolver and his fingerprints were not on the gun. Furthermore, Petitioner claimed that he "knew a lot of people and he could say he was anywhere being it was New Years and everything." Petitioner also made comments that led Esposito to conclude that Petitioner and "Righteous" had been feuding with Priester over their drug operation. [FN 2]

> [FN 2] Petitioner also told Esposito he owned a clothing store on Martin Luther King Boulevard, Blikka's clothing store. He mentioned that it was similar to a headquarters for his drug business and was often the meeting place for his friends and associates.

Esposito testified that he contacted an investigator at CRAF after Petitioner asked him to perform a favor. Petitioner had asked Esposito to relay a message to his girlfriend Shonte Ford. Because Petitioner did not have phone privileges at CRAF, he wanted Esposito to place a phone call and get in contact with Ford. Esposito became concerned that assisting Petitioner would compromise his release date from CRAF. Esposito had been working with an investigator on a separate incident, and he believed it was imperative to disclose Petitioner's request to the investigator.

On cross-examination, defense counsel showed that Esposito was a career criminal and challenged his claim that he met Petitioner at Clinton House. He demonstrated that his criminal record spanned over a decade and involved numerous offenses. In addition, defense counsel cited to documentary evidence that Petitioner never visited Clinton House. He confronted Esposito with Clinton House's visitor procedures, its sign-in policies, and other security guidelines. As a part of his inquiry, defense counsel showed that Petitioner never signed the Clinton House visitors' log. Esposito responded that Clinton House did not enforce many of its policies, and Petitioner properly visited his brother without entering the facility. He explained that Petitioner drove by the large yard connected to the facility and asked Esposito to see if his brother was available.

Defense counsel argued that Esposito's transfer out of CRAF within a few weeks of talking to the investigator was a benefit that he received for his testimony. Esposito explained, however, that his transfer was probably the result of an incident that involved an assault by a corrections officer.

D. Detective Patrick Holt

Detective Patrick Holt testified that he was working as the on-call detective for the Ewing Police Department on December 31, 2001. At approximately 5:30 p.m., he was advised of a shooting that occurred at the M&M Deli. He was directed to respond to the scene and assist with the investigation. Detective Holt arrived at the deli and learned that the victim, Robert Priester, had been shot to death while he was in a silver BMX X5.

Detective Holt did not identify any possible witnesses until January 4, 2002. On that day, Larry Dickerson, who had been arrested for shoplifting, volunteered that he had information about Priester's murder. Dickerson provided varying accounts of the shooting and related certain facts that were clearly inaccurate. In his final version

of the shooting, he told Detective Holt he observed Roberts fire several rounds into Priester's [sic]. Dickerson provided a written statement to that effect.

Based on that identification, Roberts was arrested and taken into custody. The police obtained search warrants for Roberts' residence, his business ("Blikka"), and his vehicle. The search of the vehicle led to the discovery of an address book that listed the name "Butter" with an accompanying telephone number.

During his interview with the police, Roberts claimed he was at Mason's Barber Shop at the time of the shooting. To verify Roberts' alibi, Detective Holt sought a warrant for Priester and Roberts' cell phone records. While he was on paternity leave, the Ewing Police Department also obtained phone records for Andre Bellinger and Shonte Ford, Petitioner's girlfriend. An examination of those telephone records revealed an extensive number of phone calls between Petitioner and Bellinger on December 31, and some additional calls with Roberts.

On January 7, a lieutenant at the Ewing police told Detective Holt that he had received a telephone call from an individual who identified himself as Stanley Smith. The individual asserted that the police had the wrong man in custody and that Roberts was not the shooter. The lieutenant told Holt that the caller agreed to come to headquarters to give more information.

Detective Holt eventfully [sic] interviewed Petitioner on February 11. Petitioner insisted that Roberts was at Mason's Barber Shop and that the police had the "wrong shooter." When Petitioner was asked if he knew Andre Bellinger, Petitioner's eyes "lit up" and looked as if he was "startled." Petitioner then terminated the interview.

Based on the phone records and Petitioner's response to Bellinger's name, Detective Holt investigated Bellinger's connection to the shooting. On February 16, Bellinger was arrested for a parole violation, and his parole officer notified Detective Holt. Holt interviewed Bellinger on February 19, in the presence of Bellinger's attorney. Bellinger originally stated that he was in Long Branch on December 31, but retracted his statement after Holt advised him that his phone records suggested that he was in the Trenton area. Bellinger then admitted that he went to Trenton to "hang out" with Petitioner and a friend.

Detective Holt re-interviewed Bellinger. Bellinger indicated that he drove to Trenton on December 31 to sell some narcotics. During

16

the trip, Petitioner apprised Bellinger of the dispute between Roberts and Preister. Bellinger claimed that the shooting involved an "unknown male" who fired several rounds at Priester's car window. However, he changed his story when he met with Holt on February 21. Bellinger claimed that he shot Priester through the driver's window and left the gun in Petitioner's car. Detective Holt sought to confirm this account with Dickerson, but Dickerson maintained that Roberts shot Priester.

Detective Holt spoke to Bellinger's parole officer and was told that Bellinger's best friend, Khalif Johnson, was arrested with a .357 magnum. Approximately two weeks later, on March 7, Detective Hold received a ballistics report indicating that the firearm was the weapon that was used to murder Priester. Detective Holt therefore concluded that Bellinger's second statement, in which he said he left the gun in Petitioner's car, was untrue. The following day, on March 8, Holt interviewed Bellinger again. After conferring with his attorney, Bellinger recounted the same series of events, but he clarified that Johnson was the shooter.

Three days later, on March 11, Detective Holt interviewed Johnson at the Monmouth County Prosecutor's Office. Detective Holt outlined the findings of his investigation, and disclosed that Bellinger had identified him as the shooter. Johnson requested the opportunity to meet with his father.

Johnson consulted his father and an attorney and consented to participate in another interview on March 26. Johnson's version of the events was similar to Bellinger's account. Detective Holt testified that Johnson decided to be the shooter because of Bellinger's inexperience. Johnson divulged that he had disposed of the shell casings in a sewer drain, but the casing were never recovered. After completing his statement, Johnson selected Petitioner's picture from a photo array and stated that his name was "Butter." He expressed that he was the individual who directed Bellinger to shoot Priester and led them out of Trenton. [FN 3]

> [FN 3] The police obtained a search warrant for Johnson's car, and a search of the vehicle turned up a jacket that matched the description of the shooter's jacket that had been supplied by an anonymous caller, as well as a ski cap and skull cap.

Detective Holt then addressed the phone records that were obtained while he was on paternity leave. He discovered on April 1 that his office had received toll billing records for Petitioner['s] and

17

Bellinger's cell phone without having sought an appropriate communications data warrant. He immediately notified the Prosecutor of the error and applied for warrants to obtain the phone records lawfully. He testified that the phone records corroborated Bellinger['s] and Johnson's statements. They showed numerous calls occurred that included Roberts, Bellinger, and Petitioner.

Detective Holt also investigated Bellinger and Johnson's claims that Petitioner had used a rental car to drive around the city on December 31. Detective Holt discovered that Petitioner had been arrested on January 2 by Trenton Police and was driving a Dodge Intrepid rental car from Enterprise Rental. He contacted the rental company and received confirmation of the rental.

During cross-examination, defense counsel questioned Detective Holt on his initial investigation. He pointed out a number of items were missing from the crime scene and other possible motives for the shooting. Defense counsel also raised the possibility of other suspects and went into detail about Priester's activities before the shooting.

Defense counsel cross-examined Detective Holt concerning certain deficiencies in the affidavit that supported the warrant for the phone records. In the affidavit, Detective Holt referred to Dickerson's identification of Roberts as the shooter. Defense counsel argued that Detective Holt should have included Dickerson's two prior conflicting stories about the shooting. He also asserted that Detective Holt failed to include the names of several individuals that confirmed Roberts' presence at the barber shop at the time of the shooting. Defense counsel insinuated that his failure to include these facts in the affidavit compromised his credibility.

Defense counsel challenged him to explain these omissions. Detective Holt replied that he did identify the name of one of [sic] potential alibi witnesses in the affidavit, but he refused to include the other witnesses because their information was unreliable. He asserted that use of Dickerson's identification in the affidavit was appropriate because Dickerson was certain that Roberts was the shooter.

(ECF 31-2 at 4-14).

A jury convicted Petitioner of first-degree murder of Priester, second degree possession of a weapon for an unlawful purpose and third-degree unlawful possession of a handgun. Petitioner received a sentence of thirty years imprisonment.

Petitioner then filed a direct appeal to the New Jersey Superior Court, Appellate Division. Petitioner argued on direct appeal that the prosecutor's remarks at Petitioner's trial misrepresented Johnson's actual sentencing exposure which thereby denied Petitioner his right to a fair trial. *See State v. Smith*, Dkt. No. A-2439-07T4, 2010 WL 3155971, at *1 (N.J. Sup. Ct. App. Div. Aug. 4, 2010). Ultimately, the New Jersey Superior Court, Appellate Division affirmed Petitioner's judgment of conviction. *See id.* at *6. The New Jersey Supreme Court then also affirmed in a written decision. *See Smith*, 54 A.3d 772.

As Petitioner's direct appeal progressed, Petitioner also filed a post-conviction relief ("PCR") petition. (*See* ECF 16-10). The New Jersey Superior Court Law Division dismissed that first PCR petition. (*See* ECF 17-2). On March 4, 2013, the United States Supreme Court denied Petitioner's petition for writ of certiorari on his direct appeal. *See Smith v. New Jersey*, 568 U.S. 1217 (2013).

Petitioner then filed a second PCR petition. (*See* ECF 17-5 & 31). Petitioner raised several ineffective assistance of counsel claims in that second PCR petition. More specifically, Petitioner argued that his trial counsel was ineffective for failing to call certain witnesses at trial including: (1) Shonte Ford; (2) Pelinka Jones; (3) Darryl Smith; and (4) Jerome Roberts. The New Jersey Superior Court, Law Division heard argument on this second PCR petition on April 8, 2016. (*See* ECF 16-2). Ultimately, the New Jersey Superior Court, Law Division conducted an evidentiary hearing to address portions of Petitioner's second PCR petition. (*See* ECF 16-3). The State provided the testimony of Petitioner's trial counsel, Roy Greenman, Esq. Petitioner presented the

testimony of himself, Ms. Jones and Ms. Ford to the New Jersey Superior Court, Law Division. (*See id.*). The New Jersey Superior Court, Law Division then denied Petitioner's second PCR petition in a written opinion and order. (*See* ECF 17-6 & 31-2).

The New Jersey Superior Court, Appellate Division then affirmed that denial of Petitioner's PCR petition. *See State v. Smith*, Dkt. No. A-2125-16T4, 2018 WL 6164805 (N.J. Sup. Ct. App. Div. Nov. 26, 2018). The New Jersey Supreme Court subsequently denied certification without discussion. *See State v. Smith*, 210 A.3d 242 (N.J. 2019).

Petitioner then filed a federal habeas petition pursuant to 28 U.S.C. § 2254 in this Court. (*See* ECF 1). However, as the initial federal habeas petition was not filed on the full complete form provided by this Court, this matter was administratively terminated. (*See* ECF 2). Thereafter, Petitioner filed another federal habeas petition on the proper form. (*See* ECF 3). Petitioner raises four claims in his habeas petition; namely:

1. Ineffective assistance of counsel for failing to interview and contact Pelinka Jones, Shonte Ford, Darryl Smith and Jerome Roberts ("Claim 1");

2. Prosecutor misconduct when the prosecutor assured the jury that Khalif Johnson would not receive a concurrent sentence and assuring the jury that he would receive a consecutive sentence ("Claim 2");

3. Ineffective assistance of Petitioner's PCR counsel after Petitioner told her that they needed an investigator to go to the phone company to find out who owned a particular cell-phone number ("Claim 3"); and

4. The PCR judge erred by not allowing Darryl Smith and Jerome Roberts to testify at Petitioner's PCR evidentiary hearing ("Claim 4").

(*See* ECF 3).

Respondent first filed a motion to dismiss the habeas petition due to untimeliness. (*See* ECF 13). This Court denied that motion without prejudice and Respondent was ordered to file a complete response to Petitioner's habeas petition. (*See* ECF 20). Respondent then filed an answer to the habeas petition. (*See* ECF 21). Petitioner then filed a reply in support of his habeas petition. (*See* ECF 26). This Court then ordered Respondent to file additional complete documents from the state court record to assist this Court in analyzing Petitioner's habeas petition. (*See* ECF 28). Respondent has complied with providing this Court with those additional documents. (*See* ECF 31). This matter is now ready for adjudication.

### III.    LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States. *See Engle v. Isaac*, 456 U.S. 107, 119 (1982); *see also Mason v. Myers*, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254). Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (Apr. 24, 1996), applies. *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Under AEDPA, federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court. *See* 28 U.S.C. § 2254(d).

As a threshold matter, a court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538

U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). "'[C]learly established federal law' under § 2254(d)(1) is the governing legal principle set forth by the Supreme Court at the time the state court renders its decision." *Id.* (citations omitted). A federal habeas court making an unreasonable application inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *See Williams v. Taylor*, 529 U.S. 362, 409 (2000). Thus, "a federal court may not issue a writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. *See* 28 U.S.C. § 2254€; *see also Rice v. Collins*, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); *Duncan v. Morton*, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). A petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). Furthermore, "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same

claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see also Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Rambo v. Adm'r East Jersey State Prison*, 762 F. App'x 105, 107 (3d Cir. 2019) (noting the applicability of *Ylst*'s "look through" doctrine); *Dennis Sec'y Dep't of Corr.,* 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while *Ylst* predates the passage of AEDPA, the *Ylst* presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid). These deferential standards apply "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011).

## IV.   DISCUSSION

### A.   Claim 1 – Ineffective assistance of counsel for failing to investigate and interview witnesses

In Claim 1, Petitioner argues trial counsel failed to investigate and interview several witnesses; namely (1) Shonte Ford; (2) Pelinka Jones; (3) Darryl Smith; and (4) Jerome Roberts.

#### 1.   *Shonte Ford & Pelinka Jones*

Petitioner first argues that trial counsel was ineffective for failing to investigate and interview Pelinka Jones and Shonte Ford. Petitioner raised this issue in his PCR proceedings, which included certifications from both Ms. Jones and Ms. Ford. Ms. Jones' certification stated as follows:

> 2. I have known Stanley Smith since 2000. We were very close friends. In December, 2001, I worked at Hamilton Continual Health Care in Hamilton, New Jersey as a Recreation Assistant.
>
> 3. On December 31, 2001, I had been at work and left Hamilton Continual Health Care between 4:30 and 5:00 p.m. after a short conversation with Stanley Smith. I met up with him at the Donnelly Homes on Rossell Street in Trenton where Stanley Smith was watching his three (3) kids.
>
> 4. While we (Stanley and I) were talking, some people came over and said "Someone just got shot, someone just got killed over by

M&M Deli on Calhoun Street." At the time we heard this, we were outside in front of the house.

5. Later when police were investigating the murder that occurred, I can remember being questioned, and I told the police that I didn't know anything – this was because people in my neighborhood were generally suspicious of police and afraid of them; also the questions they asked me weren't entirely clear, so that's why I answered the way I did. In spite of that, the facts I have set out in this document are true, and I was with Stanley Smith at the time that we heard about a shooting near the M&M deli.

6. I was never contacted by any attorney representing Stanley Smith (or any investigator working for Stanley Smith's lawyer) to find out what I knew, and I was not asked to testify on Stanley Smith's behalf at his trial. I would have been willing to testify then for Stanley Smith, and I am willing to testify now.

(ECF 31-1 at 46-47). Ms. Ford's certification that Petitioner included with his PCR petition stated

as follows:

2. I have known Stanley Smith since about 1987. We were very close friends. In December, 2001, I worked at TRANE Company on East State Street Extension in Trenton, New Jersey. We were living together in an apartment . . . with our children . . .

3. During the day of December 31, 2001, Stanley Smith and I were just hanging out together until about 1:30 pm when I left for work. We got back together around 10:00 p.m. and left for Atlantic City to celebrate New Year's Eve.

4. In December, 2001, I had a cell phone, but I never had a cell phone with number (609) 510-[XXXX].

5. I was never contacted by any attorney representing Stanley Smith (or any investigator working for Stanley Smith's lawyer) to find out what I knew, and I was not asked to testify on Stanley Smith's behalf at trial. I would have been willing to testify then for Stanley Smith, and I am willing to testify now.

(ECF 31-1 at 43-44). Ultimately, the PCR Court determined that it would conduct an evidentiary hearing on some of Petitioner's PCR claims. It permitted Petitioner, Petitioner's trial counsel Mr. Greenman, Esq. as well as Ms. Jones and Ms. Ford to testify. The PCR Court recounted their testimony at this PCR evidentiary hearing as follows:

24

A. Roy Greenman

The State called Petitioner's trial counsel, Roy Greenman. Mr. Greenman represented Petitioner as a pool attorney for the New Jersey Office of the Public Defender. Mr. Greenman was assigned after Petitioner's previous attorney, Vernon Clash, had to withdraw due to a conflict of interest. The initial attorney assigned to the case, Michael Robbins, had also withdrawn.

Because the trial occurred over ten years ago in 2006, Mr. Greenman had difficulty recalling many of the specific facts concerning his investigation into Petitioner's defense. Mr. Greenman testified that he took over the case from Mr. Clash when it was "ready for trial," and spoke to Petitioner three or four times before the trial began.

Mr. Greenman testified that Petitioner provided him with the name of only one possible alibi witness. Although he could not remember the witness' name, Mr. Greenman stated that she was a female and remembered speaking to her at the courthouse before opening statements. He declined to call her as a witness because she could not testify that she was with Petitioner at the time of the shooting.

> PCR COUNSEL: [Y]ou said that you spoke to a witness whose alibi you didn't feel was sufficient – whose alibi information was sufficiently strong to call that witness at trial, is that what you're telling us?
> MR. GREENMAN: What I'm saying is the witness indicated she was with Stanley Smith. When I tried to pin down the time, it appeared as if she wasn't with him until after the shooting had occurred. That's my recollection.

After he spoke to her, Mr. Greenman notified Petitioner that he would not call her as a witness. He testified that he could not recall any additional information in Petitioner's file regarding an alibi, including any notices of an alibi.

Mr. Greenman testified that he was not familiar with a woman named, "Pelinka Jones." Mr. Greenman indicated, however, that he was "not ruling out that [the female witness he spoke to] was Pelinka Jones." Mr. Greenman noted that he reviewed Mr. Jones' PCR certification and the information in her certification was consistent with the account of the unidentified witness.

As the hearing continued, Mr. Greenman was able to recall other witnesses. PCR counsel stated that Shonte Ford, Pelinka Jones, and Darryl Smith were highlighted as potential witnesses during jury selection. Mr. Greenman recognized Ms. Ford and Mr. Smith, but he emphasized that Petitioner never characterized them as "alibi witnesses." Mr. Greenman remembered that the State had traced certain phone calls in the case to Ms. Ford's cellphone, and he thought that he spoke to Ms. Ford during the trial. He recollected that a group of people attended the trial to support Petitioner, and he believed Ms. Ford was one of them.

Mr. Greenman also discussed his familiarity with Darryl Smith. Mr. Greenman was aware that Robert Esposito would testify at trial that he met Petitioner when he visited Darryl Smith at Clinton House. Mr. Greenman asserted, however, that he "didn't see any relevance to calling him as a witness," and characterized his involvement as "tangential[ ]." Mr. Greenman testified that he probably received Darryl Smith's name from Petitioner.

On re-direct, the State asked Mr. Greenman if he had acquired any useful information from the potential witnesses. Mr. Greenman stated that Petitioner never provided him with the names of any individuals that could establish a credible alibi. Mr. Greenman testified:

> THE STATE: Mr. Greenman, in all the investigation you did before starting the Stanley Smith trial, the names you were provided and the people that you met with and spoke with, did anybody ever give you any valid useable alibi information for Stanley Smith?
>
> MR. GREENMAN:   In my opinion, no.
>
> THE STATE: And if they did, you certainly would have used it, correct?
>
> MR. GREENMAN:   Yes.

Mr. Greenman testified on re-cross that Petitioner informed him that there was only one person "who could say she was with him at the time of the shooting." Mr. Greenman indicated that he made an arrangement to meet the witness at the courthouse. When he met with her, she could not confirm "that she was with [Petitioner] at the time that the shooting occurred."

B. Pelinka Jones

Ms. Jones testified that Petitioner was a "casual friend [ ]" or "a very close friend [ ]." On December 31, 2001, she was working at Hamilton Continuing Care and left work at 4:00 p.m. to meet Petitioner at his Trenton residence. She stated that she arrived at approximately 4:30 p.m. Ms. Jones stated that they sat outside on a bench while he watched his children. A few people who were in the area approached them between 5:00 and 5:30 p.m. and exclaimed that someone had been "shot up" at the M&M Deli.

Ms. Jones indicated that the police did not question her on the day of the shooting. However, on a later date, the police arrived at her residence to ask her if she knew Petitioner and was aware that he was "supposed to be involved in something." After the police asked her "quite a few questions," officers inspected her vehicle and then left the premises.

She also described her interaction with Mr. Greenman. Ms. Jones stated that she attended Petitioner's trial, but Mr. Greenman never contacted her to discuss her knowledge of Petitioner's case or his location at the time of the murder. She did acknowledge that Mr. Greenman called her to let Petitioner's family know "what time court would start, stuff like that." She said that he called her because "he knew I was in court for Petitioner" and was "there with his family." Ms. Jones speculated that Petitioner must have given Mr. Greenman her phone number.

On cross-examination, the State confronted Ms. Jones with the inconsistency between her certification and her testimony. Specifically, the State pointed out a discrepancy concerning the time that she left work. Although she certified she left work at between 4:30 p.m. and 5:00 p.m., she testified that she left at 4:00 p.m. Despite this apparent inconsistency, she repeated that she left work at 4:00 p.m. and arrived at Petitioner's residence between 4:30 and 4:35 p.m. Ms. Jones admitted that she reviewed and signed her certification, but she seemed to blame PCR counsel for the discrepancy. Ms. Jones explained, "I didn't know she was meaning that I got off work exactly 4:30. If I got off of work at 4:30, how could I be with Stanley exactly 4:30?"

Ms. Jones attempted to justify her failure to contact the police concerning her knowledge of the case and the alleged alibi. The State questioned why she did not tell the police that she was with Petitioner on the day of the shooting:

THE STATE: You know that somebody your close friends with, [Petitioner], when the police come to your house, you know he's involved in a murder investigation, correct?

MS. JONES: Um-hum.

THE STATE: You don't think it's important to tell police that you're an alibi witness for him, that you were with him at the time of the shooting?

MS. JONES: No, I didn't think it was important for me to tell that . . . I was a little nervous when the police came to my house.

THE STATE: Okay?

MS. JONES: And where I live, the police don't be coming knocking on your door. I was a little frightened. I didn't know – they didn't ask me about Stanley whereabouts. They asked me questions about a car that I had in my back yard.

THE STATE: You have information that he was not involved in that murder investigation and you don't tell the police at all. That's your testimony here today, correct?

MS. JONES: They didn't ask me no questions about the investigation.

THE STATE: But you could have told them about it, correct?

MS. JONES: But they didn't ask.

THE STATE: It doesn't matter what they asked, you still could have told them about it, correct?

MS. JONES: They didn't ask and I wasn't talking to them without no attorney.

The State then asked Ms. Jones how frequently she attended the trial. She could not recall the specific days she attended, but confirmed that she was present "sometimes." She repeated that, at that time, she did not tell anyone her information regarding the shooting, including Petitioner's attorney, the sheriff's officer in court, or the Judge.

C. Shonte Ford

Shonte Ford testified that in December of 2001, she was Petitioner's girlfriend and resided with him and their three children in Trenton. On December 31, 2001, Ms. Ford and Petitioner slept until 11:00 a.m. to 12:00 p.m. They left their residence at around 1:00-1:30 p.m. so that Petitioner could drop off Ms. Ford at work in Hamilton.

According to Ms. Ford, the children remained at home with their grandmother.

Ms. Ford indicated that she was not contacted by any attorneys or investigators regarding Petitioner's case. She also alleged that while she did not follow or attend Petitioner's trial, she did visit him at the workhouse after his arrest. She could not recall whether Petitioner told her that an attorney would contact her regarding his case.

On cross-examination, Ms. Ford reiterated that she stayed with Petitioner until around 1:30 p.m. She remained at work for an eight-hour shift, from 2:00 p.m. to 10:00 p.m. Ms. Ford testified that she would usually call Petitioner at home to check in on their kids during her break time. Although she did not recall speaking to Petitioner on this particular occasion, she indicated that she typically called every day around 5:00 or 5:15 p.m., which coincides with the time of her usual first break.

The State asked Ms. Ford why she had not disclosed her conversation with Petitioner on the day of the shooting in her certification. She claimed she did not believe it was important. When asked if she knew that the shooting was around the same time frame as her alleged phone conversation with Petitioner, Ms. Ford claimed she was unaware of the time that the shooting took place and was only aware that it happened on December 31.

D. Petitioner

Petitioner testified that Mr. Greenman was appointed sometime in July of 2006, before the case had a trial date. They met three times, which included meetings at the Justice Complex Center, [FN 4] the Mercer County Correction Center's workhouse, and the courthouse. The last meeting took place either the same day or the day after a status conference before the trial court judge. Petitioner claims that at that time, the trial judge requested Mr. Greenman to submit his witness list.

> [FN 4] Petitioner testified that this meeting took place in Susan Silver's office. Ms. Silver worked for Joe Krakora, the attorney representing Jerome Roberts, the co-defendant in this case.

When Mr. Greenman approached him to discuss witnesses, Petitioner prepared a list of witnesses that included: 1) Officer Russo, from CRAF; 2) Darryl Smith; 3) Pelinka Jones; 4) Shonte Ford; and several individuals from the halfway house on Clinton

Avenue. [FN 5] Petitioner testified that he listed the name of each individual, along with their contact information. At that time, Mr. Greenman indicated he would return to discuss the case at a later time because he had to get the witness list to the judge.

> [FN 5] Petitioner only provided certifications for Ms. Jones, Ms. Ford, and Mr. Darryl Smith. He did not identify any other witnesses at the hearing that Mr. Greenman should have called. Although he states that he provided the names of additional witnesses to Mr. Greenman, he has not provided any information concerning their ability or willingness to testify or the substance of their testimony. Any claim that Mr. Greenman should have called these witnesses at trial must fail. See State v. Cummings, 321 N.J. Super. 154, 170-71 (App. Div. 1999) (holding that a petitioner "must assert the facts that an investigation would have revealed, supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification."

Petitioner recalled that during his meetings with Mr. Greenman, Mr. Greenman believed that his case would not go to trial. Petitioner posited that this was the reason that Mr. Greenman failed to identified [sic] witnesses or possible defenses. Instead, he only discussed motions that he planned to file. He specifically recalled Mr. Greenman wanting to revisit the motion to suppress cellphone evidence and certain statements he made to the police. Petitioner explained that even though the Appellate Division had already reviewed and denied his appeal on the motion to suppress, Mr. Greenman wanted to present new arguments. However, despite his intention to follow up with the motion papers, Mr. Greenman did not raise these issues at the pre-trial conference.

Petitioner testified that Pelinka Jones had attended the trial, but he never saw Mr. Greenman speak to her. When Petitioner was deciding whether to take the stand, Petitioner again spoke to Mr. Greenman about his failure to contact witnesses. Mr. Greenman assured Petitioner that he would contact them. Petitioner offered to have Pelinka Jones and Shonte Ford appear in court, but Mr. Greenman allegedly replied, "I'll let you know [. . .] what we gonna [sic] do."

At the conclusion of Petitioner's testimony, the Court asked Petitioner when he last spoke to Ms. Jones. Petitioner asked whether the question was if he had spoken to her or communicated through

the mail and then replied, "[A] couple of days ago." As a result of Petitioner's answer, the Court recalled Ms. Jones and asked her the following questions:

> THE COURT: I have a question. Have you spoken about this case, other than to Ms. Ratner, to anyone about your testimony today?
> MS. JONES: No.
> THE COURT: You have not?
> MS. JONES: I have not.
> THE COURT: Okay. Have you spoken to anyone involved in this case?
> MS. JONES: No.
> THE COURT: Over the last several days?
> MS. JONES: No.
> THE COURT: So no conversations with any of the witnesses, Mr. Smith, other than Ms. Ratner?
> MS. JONES: No, only with Ms. Ratner.
> THE COURT: Okay. Thank you. Step down.

PCR Counsel then recalled Petitioner. She asked if he sought to influence any of the PCR witnesses.

> PCR COUNSEL:   Did you influence [Ms. Jones] about what to say to me or to anybody else in the certification for this PCR?
> PETITIONER:        No.

The Defense also asked if Petitioner had influenced anyone else who had assisted PCR counsel or any other witnesses to submit a certification. Petitioner replied that he had not.

(ECF 31-2 at 15-23).

The New Jersey Superior Court, Law Division denied Petitioner's PCR petition in a written decision and order. It first explained the relevant legal standards for analyzing ineffective assistance of counsel claims in this context as follows:

> The standard for determining whether counsel's performance was ineffective for purposes of the Sixth Amendment in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Court set forth a two-part test, later adopted by the New Jersey Supreme Court in State v. Fritz, to determine whether a defendant has been deprived of effective assistance of counsel. Strickland v. Washington, 466

31

U.S. 668, 686 (1984); State v. Fritz, 105 N.J. 42, 58 (1987).  "It is well-settled that to set aside a conviction based upon a claim of ineffective assistance of counsel, a Defendant must prove, by a preponderance of the evidence, that (1) counsel performed deficiently, and made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment; and (2) defendant suffered prejudice as a result."  State v. L.A., 433 N.J. Super. 1, 13 (App. Div. 2013).

The first prong of the Strickland test requires the court to determine whether trial counsel's performance was deficient.  Id. at 686.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Ibid.  This assessment is deferential.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy."  Id. at 689-90 (internal citations omitted).

The second prong requires Petitioner [to] "show that [counsel's] deficient performance prejudiced the defense."  Fritz, supra, 105 N.J. at 52 (quoting Strickland, supra, 466 U.S. at 687).  To establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  L.A., supra, 433 N.J. Super. At 14 (quoting Strickland, 466 U.S. at 694).  A reasonable probability is one "sufficient to undermine confidence in the outcome."  Ibid. (citation omitted).  In determining whether a defendant was prejudiced, the court must consider "the totality of the evidence before the judge or jury."  Ibid. (citation omitted).

. . . .

Failure to investigate an alibi defense is a serious deficiency that can result in the reversal of a conviction.  Indeed, "few defenses have greater potential for creating reasonable doubt as to a defendant's guilt in the minds of the jury [than an alibi]."  State v. Porter, 216 N.J. 343, 353 (2013) (quoting State v. Mitchell, 149 N.J. Super. 259, 262 (App. Div. 1977)).  However, "[c]ounsel's fear that a weak alibi could cause more harm than good is the type of strategic decision that should not be second guessed on appeal."  State v. Drisco, 355 N.J. Super. 283, 291 (App. Div. 2002) (holding that defense attorney's strategic decision not to present an alibi defense did not constitute ineffective assistance of counsel).  A court's review of a defense attorney's decision whether to call a witness should be

"highly deferential." See State v. Arthur, 184 N.J. 307, 320-21 (2005); State v. Martini, 160 N.J. 248, 266 (1999) (explaining that "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Whether this duty has been satisfied is measured by reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments")[.]

"In addressing an ineffective assistance claim based on counsel's failure to call an absent witness, a PCR court must unavoidably consider whether the absent witness's testimony would address a significant fact in the case, and assess the absent witness's credibility." L.A., supra, 433 N.J. Super. at 15. The inquiry demands a multi-factor analysis: "In considering the impact of the absent witness, a court should consider '(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.'" Id. at 16-17 (quoting McCauley-Bey v. Delo, 97 F.3d 1104, 1106 (8th Cir. 1996)).

The Court's task is not merely to compare the relative credibility of the uncalled witnesses and the witnesses presented at trial. See L.A., supra, 433 N.J. Super. at 17. Moreover, it would be improper to "rely on the jury's apparent [credibility] finding[s], [simply] because it voted to convict." Id. at 18. Rather, the Court must focus on the "totality of the evidence in making its prejudice determination." Id. at 17. In other words, the Court must determine "whether there was a reasonable probability that it, a probability sufficient to undermine confidence in the outcome that the jury would have found reasonable doubt about Petitioner's guilt had it heard from the absent witnesses." Id. at 18.

(ECF 31-2 at 26-29).

In applying the applicable relevant law to Petitioner's claims that trial counsel was ineffective for failing to call Ms. Jones and Ms. Ford to testify, the PCR Court stated as follows:

1. Mr. Greenman's conduct was not deficient

While Mr. Greenman had difficulty remembering the details of this case, the Court finds his testimony was credible. Throughout his testimony, Mr. Greenman responded directly to counsels' questions and he exhibited a professional demeanor. He struggled to recall various aspects of the trial, but his recollection improved as the

hearing progressed. Based on this Court's observations of his testimony, it did not appear that his memory lapses were the product of evasiveness or dishonesty. Instead, the gaps in his testimony were attributable to the passage of the significant period of time since Petitioner's trial.

Mr. Greenman's performance did not run afoul of [the] Strickland test. Mr. Greenman testified that Petitioner proffered one alibi witness. He interviewed her and ultimately determined that she could not attest that Petitioner was with her at the time of the shooting. Although Mr. Greenman could not recall the name of the woman, there is little doubt that the individual was Ms. Jones. Petitioner did not present the names of any other witnesses, particularly the names of any female witnesses, that could have testified to his whereabouts at the time of the shooting. Therefore, Mr. Greenman's decision to reject Mr. Jones as a witness was reasonable [sic] an appropriate exercise of discretion as trial counsel. See Strickland, supra, 466 U.S. at 689-90, 694-95 (citing Mitchel v. Louisiana, supra, at 101); Arthur, supra, 184 N.J. at 320-21 (2005).

Mr. Greenman also made a reasonable decision to not call . . . Ms. Ford as [a witness]. . . . Ms. Ford's testimony was limited to Petitioner's whereabouts on the morning of the shooting, but it did not address Petitioner's activities throughout the afternoon, including the time of the shooting. The fact that she might have spoken to Petitioner around the time of the shooting does not establish an alibi. . . . Given the limited benefit of [Ms. Jones & Ms. Ford], Mr. Greenman rendered reasonable assistance. Strickland, supra, at 694-95 (citing Mitchel v. Louisiana, supra, at 101).

2. Mr. Greenman's conduct did not prejudice Petitioner

Even if Petitioner had established the first prong of Strickland, Mr. Greenman's failure to call Ms. Ford or Ms. Jones did not prejudice Petitioner's right to a fair trial.

i.     Quality of the Testimony and Credibility of the uncalled witnesses

a.  Shonte Ford

Ms. Ford's testimony at the PCR hearing did not provide meaningful support to Petitioner's defense. Ms. Ford simply stated that she had spent the morning with Petitioner and their children, and that Petitioner dropped her off at work at around 1:30 p.m. This

testimony does not cast doubt on the substantial evidence that Petitioner met with Mr. Bellinger and Mr. Johnson and traveled with them throughout the afternoon. In addition, Ms. Ford revealed that her grandmother watched the children while she went to work with Petitioner. Because her grandmother was babysitting the children at the time she was dropped off at work, Ms. Ford's testimony could undermine Petitioner's contention that he was with his children in the afternoon. A jury could conclude that her grandmother watched the children while Petitioner drove around the city with Mr. Bellinger and Mr. Johnson. Thus, her testimony could have the unintended effect of making it more likely that Petitioner was involved in the shooting.

The integrity of her testimony was compromised by a notable omission from her certification. At the hearing, Ms. Ford claimed that she "probably" called Petitioner on December 31. Although she was not certain that she actually called, she noted that it was highly likely because it was part of her daily routine. She noted that "it was something I did every single day that he watched the kids while I was at work." Ms. Ford testified that she usually called between 5:00 and 5:15 p.m.

> THE STATE: Did you talk to [Petitioner] at all during that day on the phone?
> MS. FORD:   Oh, I always would call and check in, you know, see how the kids are doing, how he doing [sic] with the kids. I probably be calling [sic] him my first break time.
> THE STATE: Do you recall specifically speaking to Stanley on the phone that day while you had a break?
> MS. FORD:   Well, I know I called him. I always would call every day and check on the kids.
> THE STATE: Do you know what time that would have been?
> MS. FORD:   My first break was normally at – my first break, I think, was like 5 o'clock, 5 or 5:15, I'm not sure because I switched areas at my job.

The timing of this phone call coincided with the approximate time of the murder. Ms. Ford denied, however, that she was aware that the murder took place around the time of her alleged call.

> THE STATE: Well, did you know that the murder of Robert Priester took place around that general time frame, around 5 o'clock or 5:30?

> MS. FORD:   No, actually I don't know exactly
> what time it took place, I just know it took place
> around, around, December 31 because I know it was
> New Year's.

Ms. Ford's testimony is unreliable. Ms. Ford did not mention this phone call in her certification in support of Petitioner's petition, and only mentioned it for the first time during the evidentiary hearing. On cross-examination, she became evasive and sought to disavow her certification. Ms. Ford at first could not recall whether she provided a certification, but subsequently acknowledged the document. When the State asked why she omitted the phone call, she claimed that it occurred ten years ago. She then admitted that she did not remember the phone call when she executed the certification.

> THE STATE: Do you remember before you came
> into court today, you gave a certification, a statement
> about your knowledge about [Petitioner's] case. Do
> you remember giving that statement.
> MS. FORD:   No.
> THE STATE: It was a three-page document, you
> signed it, it was prepared by Ms. Ratner, the defense
> attorney today.  You don't recall that statement?
> MS. FORD:   A couple of weeks I guess – yeah.
> THE STATE: Okay.  So you do recall?
> MS. FORD:   Yeah.
> . . .
> THE STATE: If you could please look thought [sic]
> [the certification] and tell me where the portion if
> that indicates you spoke with [Petitioner] on
> December 31 of 2001, you spoke with him on the
> phone as you just testified.
> MS. FORD:   Yeah, but it's not in here.
> THE STATE: It's not in there?
> MS. FORD:   No.
> THE STATE: As a matter of fact, what's –
> MS. FORD:   I mean it's been like ten years, so –
> THE STATE: But you know it at that point; you
> didn't put it in there, correct?
> MS. FORD:   Yeah, I didn't think that it was that,
> you know, important. I didn't know that it was that
> important.

Her belief that the call was unimportant is not credible.  Her testimony could provide some support to Petitioner's defense.  It

essentially suggests that she called him the time of the murder and he might have been babysitting while she was at work. The import of such testimony is obvious, and her failure to include the details of the call in her certification is suspect. In addition, Ms. Ford's contention that she was not aware of the timing of the murder is incredible. Given Ms. Ford's intimate relationship with Petitioner at the time of the trial and her visits with Petitioner at the correctional facility, it is likely that she knew when the murder occurred.

The Court must point out that the probative value of her testimony is fairly weak. Her testimony concerning the call was merely a description of her daily routine, and her allegation that she actually called Petitioner was equivocal. Moreover, she did not have personal knowledge of Petitioner's activities at the time that she made the call. She testified that Petitioner was babysitting the children, but she noted that this was only an assumption because she was at work.

b. Pelinka Jones

Ms. Jones['] testimony at the evidentiary hearing diverged significantly from her certification.

The crucial part of Ms. Jones' testimony was the amount of time that she spent with Petitioner at his residence. In her certification, Ms. Jones represents that she left work at around 4:30-5:00 p.m. and drove to Petitioner's house. She notes that she was with Petitioner "outside in front of his house talking, when "some people came over and said 'Someone just got shot, someone just got killed over by M&M Deli on Calhoun Street.'" The certification does not specify the time that she arrived at his residence or the time that she was with Petitioner when they learned about the shooting. Ms. Jones['] certification, therefore, fails to substantiate Petitioner's alibi because it does not confirm that she was with him at the time of the shooting.

Her testimony at the hearing was markedly different. Ms. Jones testified that she left work at 4:00 p.m. and arrived at Petitioner's house at around 4:30 p.m. She stated that after she arrived, she stayed with Petitioner at his home until 6:00-6:30 p.m. Because the shooting occurred sometime between 5:00 and 5:30 p.m., her testimony showed that Petitioner was with her at the time of the shooting. Ms. Jones' sole justification for this gross inconsistency between her certification and her testimony was that "I didn't know

she was meaning that I got off work exactly 4:30. If I got off of work 4:30, how could I be with Stanley exactly 4:30?"

Her explanation for the discrepancy is specious. It is inconceivable that she confused the time that she left work with the time that she arrived at Petitioner's home. The certification explicitly provides that she ended her work day as late as 5:00 p.m. The certification does make any mention of her arrival at Petitioner's residence or the amount of time that she was in his presence. It therefore failed to address the most crucial aspect of establishing an alibi, that is, whether Petitioner was with her at the time of the murder. Her claim that she did not understand PCR counsel or the certification is implausible, in light of such a conspicuous omission. The fact that she would omit the information from her certification, only to expound upon it at the evidentiary hearing in great detail, casts doubt over the trustworthiness of her testimony.

It is also striking that Ms. Jones waited over a decade to make any attempt to exonerate the Petitioner. She had been presented with numerous opportunities to aid his defense. Ms. Jones testified that police had arrived at her home to ask her about the murder, yet she did mention [sic] anything to them. She conceded that while she may have felt uncomfortable with the police's presence in her home, she did not seek any assistance to help her contact law enforcement either before or after the trial. In addition, she indicated that she attended the trial on more than one occasion. Although she was in the presence of Petitioner, his family, the Judge, and other court staff, she remained silent throughout the court proceedings.

Ms. Jones had several opportunities to discuss the case with Mr. Greenman in court and over the phone. She testified that when she attended the trial, "[Mr. Greenman] would always been [sic] where you are sitting and he also just come and say stuff to the family and whatever." He also called to apprise her of Petitioner's court date and pass along scheduling information to Petitioner's family.

It is simply improbable that Ms. Jones did not take any steps to assist Petitioner. To credit her testimony, this court must find that she allowed her "very close friend" to be convicted of murder, and then waited nearly fifteen years to inform <u>anyone</u> that she was with Petitioner at the time of the shooting. Such a finding would be insupportable. Accordingly, the Court finds that her testimony is not credible.

ii.   Interplay of the uncalled witnesses with the actual defense
       witnesses called.

Given that the Defense did not call any witnesses at trial, and
Petitioner did not testify, the Court will proceed with the next step
in the analysis.

iii.   The strength of the evidence actually presented by the
        prosecution.

The State presented substantial evidence of Petitioner's guilt. Andre
Bellinger and Khalif Johnson both testified that Petitioner was with
them on the day of the murder. They indicated that Petitioner drove
through Trenton to facilitate Mr. Bellinger's efforts to sell crack
cocaine. Both men testified that they traveled to Jerome Robert's
[sic] house with Petitioner and discussed a plan to shoot Robert
Priester. As part of the plan, they anticipated that they would receive
compensation for the murder. Bellinger and Johnson stated that
Petitioner drove around the city to find Priester. They noted that he
was driving a rental car and that they communicated using cell
phones. The three men eventually found Mr. Priester in his vehicle
at the M&M Deli, and Mr. Johnson shot him at close range. After
the killing, Petitioner helped Mr. Bellinger and Mr. Johnson return
to I-95 and flee Trenton.

Mr. Johnson was a credible witness. His testimony was consistent
with the formal statements that he had made to Detective Holt. [Mr.]
Johnson provided a clear account of the events that transpired on
December 31, and he did not waiver under cross-examination. He
acknowledged his familiarity with Mr. Bellinger's story and was
candid about the benefits that he expected to receive as a part of the
plea agreement.

Mr. Bellinger corroborated the critical elements of Mr. Johnson's
testimony, but his credibility was flawed. Mr. Bellinger admitted
that he lied to the Detective on three separate occasions. First, he
claimed an unknown Black male shot Mr. Priester. Then he swore
that he was the shooter, before finally admitting it was Mr. Johnson.
Defense counsel also exposed other inconsistencies that affected his
credibility. One discrepancy concerned his arrival in Trenton. He
testified that he arrived with [Mr.] Johnson at 1:30 p.m., but on
cross-examination, he conceded that it might have been at 11:30
a.m.

Mr. Esposito's testimony at trial was compelling. He testified that
Petitioner disclosed numerous details about his involvement in the

shooting. His testimony contained detailed information regarding Priester's murder. It corroborated the salient portions of Mr. Johnson['s] and Mr. Bellinger's accounts of Petitioner's role in the murder. He identified the type of weapon that was used to shoot Priester and a description of his vehicle. Mr. Esposito also recognized the name of Petitioner's girlfriend, Shonte Ford.

Mr. Esposito's testimony was worthy of considerable evidentiary weight. His credibility was virtually unassailable. The State elicited that Mr. Esposito never received a plea bargain or other benefit for his appearance at the trial. Thus, he did not have any incentive [to] testify against Petitioner or falsify his testimony.

The State presented additional evidence th[at] corroborated the testimony of the witnesses. Detective Holt provided a thorough and comprehensive overview of his investigation. He answered questions directly and spoke candidly about the inconsistent accounts provided by some of the witnesses. He testified concerning the numerous phone records, which captured the multiple conversations among Mr. Roberts, Petitioner, and Mr. Bellinger. In addition, the State introduced evidence of Petitioner's relationship with Mr. Roberts, which included the discovery of his name in Mr. Roberts' address book. It also offered evidence of Petitioner's rental car. The State's documentation corroborated Mr. Bellinger['s] and Mr. Johnson's statements that Petitioner was driving a rented Intrepid on the day of the shooting.

iv.    Totality of the evidence

As noted previously, the Court finds that Ms. Ford and Ms. Jones are unreliable witnesses, and the quality of their proffered testimony is poor. This Court[ ] must point out, as part of its credibility assessment, that Ms. Ford is the mother of Petitioner's children. Moreover, Ms. Jones is a very close friend. Petitioner readily admitted at the hearing that he still communicates with her. Both individuals have every incentive to testify in favor of Petitioner and assist his effort to secure a new trial. It is evident, based on their words and their demeanor, that their relationships with Petitioner influenced their testimony. See, e.g., Ball v. United States, 271 Fed. Appx. 880, 884 (11th Cir. 2008) (finding that "[the defendant's] alibi witnesses were all close family members with a strong motive to fabricate an alibi defense for him. . . . . If trial counsel had called these alibi witnesses and the jury had disbelieved them, the jury also could have inferred that [the defendant] was in fact [guilty]"). Their lack of credibility and flawed testimony render them incapable of supporting a valid alibi defense or otherwise casting doubt on

Petitioner's guilt.  See L.A., supra, 433 N.J. Super. at 15 (holding that the "question is whether the nature and quality of the evidence is such that there is a reasonable probability that the jury would have credited it and rendered a more favorable verdict" (internal citations omitted)).

The State's evidence was more than sufficient to sustain the verdict. The State presented a number of credible witnesses and persuasive evidence that tied Petitioner to the murder of Mr. Priester.  The State showed that the motive for the murder was retaliation.  Mr. Roberts was involved in a shooting with Mr. Priester, and he worked with Petitioner to exact retribution.    The numerous phone records captured the multiple conversations that Mr. Bellinger['s] and Mr. Johnson's testimony concerning the events that led up to the murder and the aftermath of the shooting.  The State also presented the credible testimony of Mr. Esposito, a disinterested third party, who was able to describe the murder in detail, even though he was incarcerated the day the murder took place.    Although Mr. Bellinger's credibility was weakened by some of his prior inconsistent statements to Detective Holt, his testimony was largely in accord with the State's evidence and accounts of the various witnesses.  Thus, the totality of the evidence against Petitioner was strong.  The proffered testimony of Ms. Jones and Ms. Ford is inadequate to undermine the confidence in the outcome of the trial, and thus fails to establish the second prong of Strickland. Strickland, supra, 466 U.S. at 693.

(ECF 31-2 at 29-39).

The New Jersey Superior Court, Appellate Division, affirmed the PCR Court's decision on these ineffective assistance of counsel claims for essentially the reasons given by the PCR Court. See Smith, 2018 WL 6164805, at *2 ("We affirm the denial of defendant's PCR petition for the reasons set forth in Judge Lydon's thoughtful and cogent written opinion.").  It further stated as follows though:

In reviewing ineffective assistance claims, courts apply a strong presumption that a defendant's trial counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690. "[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy[.]"  Fritz, 105 N.J. at 54 (quoting State v. Williams, 39 N.J. 471, 489 (1963), overruled on

other grounds by State v. Czachor, 82 N.J. 392 (1980) ).  To demonstrate the likelihood of succeeding under the Strickland/Fritz test, a defendant "must do more than make bald assertions[,] . . . [and] must allege facts sufficient to demonstrate counsel's alleged substandard performance."  State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).

We reject all of defendant's arguments asserting ineffective assistance of counsel for the reasons expressed in Judge Lydon's comprehensive written decision.

The PCR judge found the testimony of defendant's trial counsel credible and the testimony of defendant's alibi witnesses unreliable and poor.  The judge concluded defense counsel made a strategic litigation decision that the testimony of the proffered witnesses was more problematic than helpful to defendant.

*Smith*, 2018 WL 6164805, at \*3.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the Supreme Court articulated a two-prong test for demonstrating when a petitioner is entitled to federal habeas relief on an ineffective assistance of counsel claim.  First, a petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See id.* at 688; *see also Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all of the circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690.  Under the first prong of *Strickland*, scrutiny of counsel's conduct must be "highly deferential." *See id.* at 689.  Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.  The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the

strategic choices he makes accordingly are "virtually unchallengeable." *Gov't of Virgin Islands v. Weatherwax*, 77 F.3d 1425, 1432 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). If, on the other hand, counsel pursues a certain strategy after a less than complete investigation, his choices are considered reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91).

The second prong of *Strickland* requires a petitioner to affirmatively show prejudice. *See* 466 U.S at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also McBridge v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n.11 (3d Cir. 2012). "This does not require that counsel's actions more likely than not altered the outcome, but the difference between *Strickland's* prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citations omitted).

"With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" *Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

When assessing an ineffective assistance of counsel claim in the federal habeas context, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Grant*, 709 F.3d at 232 (quoting *Harrington*, 562 U.S. at 101). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011)). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

The state courts' denial of Petitioner's ineffective assistance of counsel claim regarding failure to call Ms. Ford and Ms. Jones as witnesses was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. As indicated above, the PCR Court conducted an evidentiary hearing on whether counsel was ineffective for failing to call these two witnesses as Petitioner's trial. The PCR Court was able to hear their live testimony and found both witnesses not credible. Such a finding is entitled to a presumption of correctness unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Petitioner has failed to make such a showing here.

Ms. Ford's testimony had limited probative value. She was not an alibi witness as she could not state with any certainty Petitioner's whereabouts when the murder occurred. *See Hernandez v. Chappell*, 923 F.3d 544, 557 (9th Cir. 2019) (counsel was not deficient in failing to call witness whose evidence had "minimal probative value"). With respect to Ms. Jones, Petitioner's trial counsel testified that he essentially met with her and found that she could not

attest that she was with Petitioner at the time of the shooting. Thus, Mr. Greenman's failure to call Ms. Jones does not render counsel's performance deficient. Certainly, at a minimum, the state courts' denial of this claim based on the first prong of the *Strickland* test was not contrary to, or an unreasonable application of the first prong of *Strickland* given the testimony at the PCR evidentiary hearing as well as the credibility findings, which this Court presumes to be correct on habeas review. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a state court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence).

Additionally, the Appellate Division also found that Petitioner failed to establish *Strickland's* prejudice prong with respect to counsel's purported ineffectiveness in not calling these two witnesses at trial. The Appellate Division properly reaffirmed the PCR Court's finding that the trial evidence against Petitioner was strong. *See Smith*, 2018 WL 6164805, at *3. This Court agrees.

At trial, Mr. Bellinger testified at length about the role Petitioner had in the murder. Mr. Bellinger testified after unsuccessfully attempting to sell narcotics in and around Trenton, he and Petitioner met with Mr. Roberts upstairs at a residence on December 31, 2001. (*See* ECF 14-10 at 56). Mr. Roberts gave Mr. Bellinger a gun and it was explained that they [Mr. Roberts and Petitioner] wanted Mr. Priester killed. (*See id.* at 58-59).

Mr. Bellinger then testified that he and Mr. Johnson followed Petitioner around in his car in Trenton to try and look for the victim, Mr. Priester. (*See* ECF 14-10 at 61). Mr. Bellinger then stated that at one point, he and Mr. Johnson got into Petitioner's vehicle to continue the search. (*See id.* at 62). Eventually, when Mr. Priester was located, Mr. Bellinger testified at trial that they decided to return to get their [Mr. Johnson's] car. (*See id.*). Mr. Bellinger stated that Petitioner

was then going to lead them out of Trenton after "the harm" was done because he and Mr. Johnson were not from the area. (*See id.* at 62-63). Mr. Bellinger, along with Mr. Johnson, then followed Petitioner back to Mr. Priester's location outside the delicatessen. (*See id.* at 64). Upon arrival, Petitioner parked his car in front of Mr. Bellinger and Mr. Johnson's vehicle. Mr. Johnson then shot Mr. Priester according to Mr. Bellinger's testimony. (*See id.*). Immediately after the shooting, Mr. Bellinger spoke to Petitioner on the phone and told him to "get us the fuck out of here." (*See id.*). Mr. Bellinger along with Mr. Johnson then followed Petitioner out of Trenton onto I-95. (*See id.* at 64-65).

Mr. Johnson's testimony at trial also implicated Petitioner in the crimes. Mr. Johnson testified that he and Mr. Bellinger initially met up with Petitioner on December 31, 2001, to sell drugs in and around Trenton. (*See* ECF 15-1 at 24-25). Mr. Johnson then stated that they went to Mr. Roberts's house and Mr. Bellinger and Petitioner went inside. (*See id.* at 27). When Mr. Bellinger returned, he had a gun and that he [Mr. Bellinger] was going "to put some work in" and asked Mr. Johnson if he wanted to help. (*See id.*). Mr. Johnson then testified that he told Mr. Bellinger that he would help him. (*See id.*). Mr. Johnson then stated that they followed Petitioner's vehicle. (*See id.* at 30). Mr. Johnson, similar to Mr. Bellinger, then testified that they followed Petitioner to where Mr. Priester was stationed. (*See id.* at 34). Petitioner then parked his car in front of theirs. (*See id.* at 35). Mr. Johnson then got out of the car and shot Mr. Priester. (*See id.*). Mr. Johnson then returned to his vehicle whereupon Petitioner lead them out of Trenton. (*See id.* at 36).

Mr. Esposito's testimony at trial also firmly implicated Petitioner in the murder. He and Petitioner were placed in neighboring cells at CRAF. (*See* ECF 15-2 at 16). Eventually, Petitioner told Mr. Esposito that he had provided a gun (a .357) to someone and that his friend had shot a guy

in a car because Petitioner had a beef with him. (*See id.* at 17). Mr. Esposito also testified that Petitioner told him the car the victim was shot in was a gray BMW further corroborating the evidence. (*See id.*).

Certainly, at a minimum, for essentially the reasons stated by the PCR Court, namely the testimony of Mr. Bellinger, Mr. Johnson and Mr. Esposito described in part above, this Court cannot say that such a decision also based on *Strickland's* prejudice prong with respect to the failure to call these two witnesses (Ms. Ford and Ms. Jones) at trial was contrary to, or an unreasonable application of clearly established federal law, nor was the denial of these ineffective assistance of counsel claims based on *Strickland's* prejudice prong based on an unreasonable determination of the facts.

Accordingly, for the reasons stated above, these two ineffective assistance of counsel claims are denied.

2. *Darryl Smith*

Next, Petitioner argues that trial counsel was ineffective for failing to investigate Darryl Smith as a potential witness at his trial. Darryl Smith provided a certification in support of Petitioner's PCR petition. Darryl Smith stated as follows in his certification:

> [¶ 2] Stanley Smith is my brother. Although I was incarcerated when Robert Priester was murdered and do not have any particular information about the incident, I can say without hesitation that I never met Robert Esposito.
>
> [¶ 3] I was never contacted by any attorney working for my brother asking me to testify at his trial in 2006. I would have been willing to testify for my brother then, and I am willing to testify now.

(ECF 31-1 at 49).

The last reasoned decision on this claim was from the New Jersey Superior Court, Law Division during Petitioner's PCR proceedings. That court denied this claim as follows:

[H]e [Petitioner] contends that Mr. Greenman should have called Darryl Smith as a witness.  Petitioner argues that Mr. Esposito falsely claimed that he had a relationship with Darryl Smith to "make it more likely that the jury would believe" that Petitioner spoke to him at CRAF.  Petitioner submitted a certification from Darryl Smith, who attests that he had never met Mr. Esposito.  He insists that Darryl Smith's testimony, as set forth in his certification, was essential to show that Mr. Esposito was lying.

Mr. Greenman rendered reasonable professional assistance to Petitioner.  Mr. Greenman questioned Mr. Esposito extensively on Clinton House's policies concerning visitors and their contact with detainees at the half-way house.  He confronted Mr. Esposito with the facility's visitor logs, which suggested that Petitioner never visited Darryl Smith.  Mr. Greenman also demonstrated that the policies of Clinton House restricted Mr. Esposito's opportunities to interact with Petitioner on a frequent basis.  [FN 8]  In addition, Mr. Greenman reasonably determined that Darryl Smith's proffered testimony was irrelevant and "tangential."  The impact of his testimony is insignificant because it only challenges Mr. Esposito's claim that he met Petitioner at Clinton House.  It does not address Mr. Esposito's damning allegation that Petitioner described the murder to him when they shared adjacent cells at CRAF.  Thus, the failure to call Darryl[ ] Smith as a witness does not erode confidence in the verdict or warrant an evidentiary hearing.

> [FN 8] To the extent Petitioner believes that the cross-examination was inadequate, the record shows that it was comprehensive and exposed the weaknesses in Mr. Esposito's testimony.  There is little doubt that Mr. Greenman's cross-examination fell well within the range of reasonable professional assistance.  *Strickland, supra*, at 694-95; *See State v. Arthur*, 184 *N.J.* 307, 320-21 (2005) (holding that defendant is entitled to reasonable, and not necessarily the best, representation).

(*See* ECF 31-2 at 44-45).

The state court did not act contrary to, nor unreasonably apply clearly established federal law, nor did it unreasonably apply the facts in denying this claim.  Darryl Smith's testimony was mostly tangential.  *See, e g.*, *McFadden v. Beard*, No. 09-5952, 2011 WL 1361448, at *22 (E.D. Pa. Mar. 1, 2011) (noting state court did not unreasonably apply *Strickland* when it denied

petitioner's ineffective assistance of counsel claim regarding presenting witnesses because the witnesses' testimony was largely tangential and would not have helped petitioner). While Darryl Smith's testimony could have potentially raised some credibility issues about certain aspects of Mr. Esposito's testimony, as Darryl Smith readily admits in his certification filed in support of Petitioner's PCR petition, he had no knowledge about the murder. (*See* ECF 31-1). Furthermore, Darryl Smith, as Petitioner's brother, could have been subject to impeachment due to his biasness towards his brother. *See Bergman v. Tansy*, 65 F.3d 1372, 1380 (7th Cir. 1995) (holding counsel was not ineffective for failing to call family members who would have easily been impeached for bias); *Romero v. Tansy*, 46 F.3d 1024, 1030 (10th Cir. 1995) (noting testimony by defendant's family members is of "significantly less exculpatory value than the testimony of an objective witness"). Given these circumstances, coupled with the other testimony that directly and expressly implicated Petitioner at trial from Detective Holt, Mr. Bellinger and Mr. Johnson, this Court finds Petitioner has failed to show that Petitioner's trial counsel's performance fell below an objective standard of reasonableness and/or that he was prejudiced for counsel's failure to call his brother as a witness. This claim is therefore denied.

    3. *Jerome Roberts*

    Next, Petitioner claims that trial counsel was ineffective for failing to call Jerome Roberts as a witness at his trial. Petitioner alluded to trial counsel's failure to call Mr. Roberts in his PCR brief. (*See* ECF 31-1 at 73). Furthermore, in Petitioner's certification accompanying his PCR petition, he stated that he gave Mr. Roberts's name to his trial counsel as a witness who could have been useful in attacking the credibility of the State's witnesses. (*See* ECF 31-1). Additionally, Petitioner's PCR petition included the certification of Mr. Roberts whereby he stated as follows:

[¶ 2] I have a lot of information about the case involving Stanley Smith. Stanley Smith had nothing to do with the murder of Robert Priester. Khalif Johnson (who was with Andre Bellinger) shot Priester, and all of this was about a favor for me. I also was not at the shooting. The talk about the shooting began a day or two before it (or maybe even earlier) when Bellinger said he would do me a favor if I would do a favor for him.

[¶ 3] Based on phone conversations on the day of the murder (December 31, 2001), when we were discussing plans for New Year's Eve, I knew that Stanley Smith was with Pelinka Jones at the time of the shooting. I tried to tell the Prosecutor that Stanley Smith was not involved in the case at all.

[¶ 4] I was never contacted by any lawyer working for Stanley Smith and asked to testify at his trial. I would have been willing to testify then, and I am willing to testify now.

(ECF 31-1 at 51).

The New Jersey Superior Court, Law Division in deciding Petitioner's PCR petition did not discuss Petitioner's claim that trial counsel was ineffective for failing to call Mr. Roberts as a witness. On appeal, the New Jersey Superior Court, Appellate Division noted as follows with respect to this claim:

Regarding the failure of defense trial counsel to investigate whether . . . J.R. [Jerome Roberts] had information to serve as [an] exculpatory witness[ ] at defendant's trial, this issue was not presented to the PCR judge. We decline to review issues not presented to the trial court unless the issue is jurisdictional or concerns a matter of public importance. See Zawan v. Felton, 219 N.J. 199, 227 (2014) (quoting Nieder v. Royal Idem. Ins. Co., 62 N.J. 229, 234 (1973)). Because the issue raised by defendant for the first time on appeal is not jurisdictional or a matter of public importance, we decline to consider the argument.

*Smith*, 2018 WL 6164805, at *3.

Where a petitioner fairly presents a claim to a state court, but the state court fails to address it, a federal habeas court reviews that claim *de novo*. *See Jacobs v. Horn,* 395 F.3d 92, 100 (3d Cir. 2005) ("In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review."); *Holloway v. Horn,* 355 F.3d 707, 718 (3d Cir. 2004) (reviewing a claim *de novo* because Petitioner presented it to the Pennsylvania Supreme Court, but the court "failed to even mention" it). In determining whether a petitioner has fairly presented a federal claim to the state courts, a petitioner must have "presented a federal claim's factual and legal substance to the state courts in a manner that put the state courts on notice that a federal claim was being asserted." *See Wilkerson v. Superintendent Fayette SCI,* 871 F.3d 221, 227 (3d Cir. 2017) (citing *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)). Generally, a petitioner may "fairly present" his federal claim in four ways: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Evans v. Court of Common Pleas, Del. County, Pa.*, 959 F.2d 1227 (3d Cir. 1992).

As indicated above, Petitioner noted trial counsel's purported failure to call Mr. Roberts as a witness at his trial in both his own certification accompanying his PCR petition, his PCR brief as well as alluding to such a claim by including Mr. Roberts' certification with his PCR petition. Based on this Court's review of the record, it appears Petitioner fairly presented this claim in his PCR proceedings, but it was not addressed by the state court. Accordingly, this Court will apply a *de novo* review in analyzing this claim.

This Court finds that Petitioner fails to show that he is entitled to federal habeas relief on this ineffective assistance of counsel claim. Generally, a *de novo* review would perhaps require this Court to conduct an evidentiary hearing to ascertain trial counsel's reasons for not calling Mr. Roberts as a potential witness. *See Branch v. Sweeney*, 758 F.3d 226, 228 (3d Cir. 2014). However, during Petitioner's PCR proceedings, Petitioner's trial counsel provided sufficient testimony that would render a further evidentiary hearing by this Court unwarranted. For example, Petitioner's trial counsel, Mr. Greenman specifically testified during the PCR proceedings that Petitioner never provided him with the names of *any individuals* that could establish a credible alibi. Specifically, Mr. Greenman testified as follows:

> THE STATE: Mr. Greenman, in all the investigation you did before starting the Stanley Smith trial, the names you were provided and the people that you met with and spoke with, did anybody ever give you any valid useable alibi information for Stanley Smith?
>
> MR. GREENMAN:   In my opinion, no.
>
> THE STATE: And if they did, you certainly would have used it, correct?
>
> MR. GREENMAN:   Yes.

Indeed, on re-cross, Mr. Greenman testified that Petitioner proffered one alibi witness. Mr. Greenman explained that he interviewed her (Ms. Jones) and ultimately determined that she could not attest that Petitioner was with her at the time of the shooting. (ECF 31-2 at 15-23). And, the state court, having the benefit of Ms. Jones's testimony during the PCR proceedings determined that she was not credible in her statement that she was with Petitioner at the time of the murder in order to provide an alibi for Petitioner. Moreover, as the state court noted, "Petitioner did not present the names of any other witnesses . . . that could have testified to his whereabouts at the

time of the shooting." (ECF 31-2 at 29-39). Therefore, although Mr. Greenman was not specifically asked about Mr. Roberts, it is clear from the PCR proceedings that Mr. Greenman did not believe there were any witnesses available to provide an alibi for Petitioner and certainly not one that implicated Ms. Jones as an alibi witness.

In addition, Petitioner fails to show that had Mr. Roberts testified, the outcome of his trial would have been different to a reasonable probability. Mr. Roberts's certification states that Petitioner was with Ms. Jones at the time of the shooting "[b]ased on phone conversations on the day of the murder." Mr. Roberts gives no indication whatsoever regarding what transpired during these phone conversations that led him to conclude that Petitioner and Ms. Jones were together at the time of the murder. In essence, Mr. Roberts's certification seeks to buttress Petitioner's alibi with respect to Ms. Jones. Again, Ms. Jones *did* testify during Petitioner's PCR proceedings. Ms. Jones as an alibi witness was found not to be credible as described *supra*. Nothing in Mr. Roberts's conclusory certification changes that fact, and certainly not to a reasonable probability under *Strickland's* prejudice prong to change the outcome of Petitioner's trial given the trial testimony from Mr. Bellinger, Mr. Johnson and Mr. Esposito, all of whom clearly implicated Petitioner in the murder or Mr. Priester. *See Klein v. Superintendent Smithfield SCI*, 844 F. App'x 531, 535 n.16 (3d Cir. 2021) (affirming the district court's denial of claim for habeas relief on the grounds that the proposed alibi testimony lacked specificity and was unsupported by corroborating evidence and distinguishing *Branch* where in that case the jury "quite clearly was torn" and "sent a number of questions to the court during deliberations.") Further, it is worth noting that in claiming that counsel was ineffective for failing to investigate, a petitioner must make a comprehensive showing as to what the investigation would have produced, that the evidence would have been admissible, and how it would have changed the outcome of his proceeding to a

reasonable probability to meet the *Strickland* prejudice standard. *See, e.g.*, *Brown v. United States*, No. 13-2552, 2016 WL 1732377, at *5 (D.N.J. May 2, 2016) (citing *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996)) (other citations omitted). Petitioner's claim of ineffectiveness for failing to investigate and call Mr. Roberts as a witness fails to establish that comprehensive showing. Thus, Petitioner fails to show that he is entitled to federal habeas relief on any of his ineffective assistance of trial counsel claims.

### B. Claim 2 – Prosecutorial Misconduct Regarding Johnson's Sentence

In Claim 2, Petitioner argues that the prosecutor committed misconduct when he assured the jury that Mr. Johnson would receive a consecutive rather than a concurrent sentence by testifying at Petitioner's trial. The last reasoned decision on this claim was from the New Jersey Supreme Court on Petitioner's direct appeal which analyzed this claim as follows:

> New Jersey courts have commented repeatedly on the special role filled by those entrusted with the responsibility to represent the State in criminal matters, observing that the primary duty of a prosecutor is not to obtain convictions but to see that justice is done. *State v. Daniels,* 182 *N.J.* 80, 96, 861 *A.*2d 808 (2004) (noting "prosecutor's overarching obligation always remains 'not to obtain convictions, but to see that justice is done'" (quoting *State v. Frost,* 158 *N.J.* 76, 82, 727 *A.*2d 1 (1999))); *State v. Zola,* 112 *N.J.* 384, 426, 548 *A.*2d 1022 (1988). "Those entrusted with the responsibility of representing the State at criminal prosecutions must never forget their fundamental obligation is not to convict but to see that justice is done. If fairness and justice are forgotten in the pursuit of a guilty verdict, the integrity and authority of our criminal justice system is challenged." *State v. Goode,* 278 *N.J. Super.* 85, 91–92, 650 *A.*2d 393 (App. Div. 1994).
>
> A prosecutor is nonetheless entitled to argue the merits of the State's case "graphically and forcefully," *State v. Feaster,* 156 *N.J.* 1, 58, 716 *A.*2d 395 (1998) (quoting *State v. Marquez,* 277 *N.J. Super.* 162, 171, 649 *A.*2d 114 (App. Div. 1994)), and is not required to present those arguments as if he were addressing a lecture hall, *State v. Johnson,* 31 *N.J.* 489, 510–11, 158 *A.*2d 11 (1960). The duty of the prosecutor "'is as much . . . to refrain from improper methods calculated to produce a wrongful conviction as it is to use every

legitimate means to bring about a just one.'" *Frost, supra,* 158 *N.J.* at 83, 727 *A.*2d 1 (quoting *State v. Farrell,* 61 *N.J.* 99, 105, 293 *A.*2d 176 (1972)). In fulfilling that two-pronged duty, prosecutors should be guided by the maxim that they "may strike hard blows, [but] not ... foul ones." *Feaster, supra,* 156 *N.J.* at 59, 716 *A.*2d 395 (quoting *Berger v. United States,* 295 *U.S.* 78, 88, 55 *S. Ct.* 629, 633, 79 *L. Ed.* 1314, 1321 (1935)).

An appellate court, in reviewing the trial record to determine whether the conduct of the prosecutor exceeded these bounds, must consider several factors, including whether "timely and proper objections" were raised, *Frost, supra,* 158 *N.J.* at 83, 727 *A.*2d 1; whether the offending remarks "were withdrawn promptly," *ibid.;* and whether the trial court struck the remarks and provided appropriate instructions to the jury, *ibid.* Additionally, an appellate court will consider whether the offending remarks were prompted by comments in the summation of defense counsel. *State v. R.B.,* 183 *N.J.* 308, 329–30, 873 *A.*2d 511 (2005); *State v. Wilson,* 128 *N.J.* 233, 241–42, 607 *A.*2d 1289 (1992); *State v. Williams,* 317 *N.J. Super.* 149, 721 *A.*2d 718 (App. Div. 1998), *certif. denied,* 157 *N.J.* 647, 725 *A.*2d 1128 (1999). If, after completing such a review, it is apparent to the appellate court that the remarks were sufficiently egregious, a new trial is appropriate, even in the face of overwhelming evidence that a defendant may, in fact, be guilty. *Frost, supra,* 158 *N.J.* at 87, 727 *A.*2d 1 (noting overwhelming evidence was no justification to deprive defendant of constitutionally guaranteed right to fair trial). In contrast, if the prosecutorial remarks were not "so egregious that [they] deprived the defendant of a fair trial[,]" reversal is inappropriate. *Id.* at 83, 727 *A.*2d 1; *see State v. Ramseur,* 106 *N.J.* 123, 322, 524 *A.*2d 188 (1987). . .

The first portion of the prosecutor's summation to which defendant objects dealt with the testimony of Khalif Johnson. We outlined earlier in our opinion Johnson's testimony, which clearly inculpated defendant and Roberts as the masterminds of the shooting. Defendant's attorney, in his summation, attempted to persuade the jury that it should reject Johnson's testimony.

> . . . . He [Johnson] sat on the witness stand and said despite the fact, despite the fact that he pled guilty to attempted murder three weeks after this incident took place, with the murder weapon, his murder weapon, that his deal was not for murder. It was for aggravated manslaughter. His deal was not for the maximum for aggravated manslaughter, but for 25

years. And in his mind, the way his attorneys explained it to him, he was hoping that that sentence would be concurrent to the sentence he was doing on the separate murder. Concurrent, running at the same time. So not even close to the 25 years if, in fact, his attorney was correct. That's the deal. And even if he didn't get concurrent time, he got consecutive, what an unbelievable deal he worked out for himself simply by saying what Detective Holt wanted to hear, what he told him he wanted to hear, what he gave him he wanted to hear, and what Khalif Johnson regurgitated.

The prosecutor, in his summation, attempted to rebut these remarks and to convince the jury that Johnson was indeed a credible witness. On cross-examination, it was inferred that perhaps there was a concurrent sentence being offered by the Mercer County Prosecutor's Office in return for the testimony of Khalif Johnson. And you recall, it was brought out that he was serving a 20–year sentence for the charge in Monmouth County. Showed him the plea agreement. The plea is for 25 years. There is no deal for a concurrent sentence. Mr. Johnson acknowledged that. That's a maximum of 45 years without parole. 45 years, ladies and gentlemen. A long, long time.

Johnson had not been sentenced for his involvement in this matter at the time of defendant's trial and when these remarks were made. Johnson appeared for sentencing on March 2, 2007, several months before the trial court heard argument on defendant's motion for a new trial.

Those sentencing proceedings were remarkably brief. The entire argument of the prosecutor (who was the same prosecutor who had tried the case against defendant) was the observation that Johnson "did meet all the requirements of cooperation as noted in the plea agreements. . . ." He did not attempt to address the question whether Johnson's sentence should run concurrently or consecutively with the Monmouth County sentence he was serving. Johnson's attorney urged the sentencing court that even though the plea agreement called for a sentence of twenty-five years, Johnson should receive a lesser sentence and asked the court to "consider 20 years with an 85 percent. We know that in running that concurrent with the Monmouth County sentencing . . . Mr. Johnson knows he's in jail for quite some time. He understands that."

The sentencing court proceeded to review the appropriate statutory aggravating and mitigating factors, *N.J.S.A.* 2C:44–1a1b, concluded it would "abide by the terms of the plea agreement," and sentenced defendant to twenty-five years in prison, subject to *N.J.S.A.* 2C:43–7.2. After noting the appropriate fines, penalties, and jail credits, the sentencing court asked Johnson if he understood the sentence that had been imposed, and Johnson replied that he did. The sentencing court then directed that Johnson's sentence would "run concurrently and not consecutively with the defendant's present sentence."

Defendant points to this concurrent sentence and argues that the statements made by the prosecutor in his summation were made to mislead the jury about the sentencing exposure Johnson faced as a result of his guilty plea. The prosecutor insists that there was no deal reached with Johnson for a concurrent sentence when he entered his guilty plea and that his remarks in summation were entirely accurate.

The record before us on this issue consists of the transcript of Johnson's guilty plea, the plea form he executed at the time of his guilty plea, and the sentencing transcript. The transcript of Johnson's guilty plea and the executed plea form are, indeed, entirely silent with respect to the issue. They contain no mention of a promise of a concurrent sentence. From that record, we can perceive no basis to conclude that the prosecutor's remarks in summation constituted prosecutorial misconduct.

We are in no position, however, to assess whether defendant's attorney may be able to marshal additional evidential support for his position that there was an unspoken, but mutually understood, element to Johnson's plea negotiations, that he would receive a concurrent sentence. Defendant is thus not foreclosed from seeking post-conviction relief if such evidential support can be gathered.

*Smith*, 54 A.3d at 793–96.

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial fundamentally unfair. *See Darden v. Waingright,* 477 U.S. 168, 182–83 (1986). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 181 (internal quotation marks and citation omitted). A prosecutorial misconduct claim is examined in

"light of the record as a whole" in order to determine whether the conduct "had a substantial and injurious effect or influence" on the jury's verdict. *See Brecht v. Abrahamson,* 507 U.S. 619, 638, (1993). A "reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton,* 255 F.3d 95, 107 (3d Cir. 2001).

The New Jersey Supreme Court's denial of this claim was not contrary to, or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts. As noted by the New Jersey Supreme Court, the record did not indicate that there was a deal for a concurrent sentence for Mr. Johnson at the time of Petitioner's trial.

Respondent's initial exhibits submitted to this Court did not include Mr. Johnson's plea transcripts and plea form relied upon and cited by the state court in reaching its conclusion that there was no unconstitutional prosecutorial misconduct. Accordingly, to assist this Court in analyzing whether the state court's decision was based on an unreasonable determination of the facts, this Court ordered Respondent to include these documents in this case. (*See* ECF 34). Respondent then submitted these documents upon the Court's request. (*See* ECF 37). Johnson's plea form submitted by Respondent though illegible as the electronic copy's handwriting is too faint regarding whether "any other" promises or representations were made by the prosecutor regarding his guilty plea, such as whether the prosecutor promised that he would seek a concurrent rather than a consecutive sentence. (*See* ECF 37-2 at 3). This illegibility does not necessarily mean that Petitioner is entitled to habeas relief. Indeed, in the plea transcript, when Petitioner was expressly asked whether the State made "any other promises to [him]" to which Petitioner testified "No." (*See* ECF 37- at 12). Given this representation by Petitioner at the plea hearing, this Court

cannot find that the New Jersey Supreme Court's determination that Mr. Johnson was not promised a concurrent rather than a consecutive sentence by pleading guilty constituted an unreasonable determination of the facts by the state court which last analyzed this claim.[1]

Accordingly, this statement by the prosecutor at Petitioner's trial during the summation did not so infect the trial to warrant Petitioner's trial unfair. This Court has previously noted the quantum of evidence against Petitioner, which included the testimony from Mr. Bellinger, essentially corroborated by Mr. Johnson, which detailed Petitioner's role in the murder of Mr. Priester. Their testimony, coupled with Mr. Esposito's testimony in which Petitioner essentially confessed to his role in the murder leads this Court to conclude that this statement by the prosecutor did not make Petitioner's trial unfair. Accordingly, Claim 2 is denied.

C.  Claim 3 – Ineffective Assistance of PCR Counsel

In Claim 3, Petitioner asserts PCR counsel was ineffective when she failed to turn over an investigator's findings regarding who owned cellphone (609) 510-(XXXX). Petitioner is not entitled to federal habeas relief on this claim. Indeed, 28 U.S.C. § 2254(i) precludes claims for ineffective assistance of PCR counsel. *See also Martinez v. Ryan*, 566 U.S. 1, 17 (2012). Thus, this claim is denied.

D.  Claim 4 – PCR Court erred by not permitting Darryl Smith and/or Jerome Roberts to Testify

In Claim 4, Petitioner asserts that the PCR Court erred by not permitting Darryl Smith and/or Jerome Roberts to testify. However, such a *freestanding separate* claim of *PCR court* error is not cognizable in these federal habeas proceedings. *See Sayers v. Adm'r New Jersey State Prison*, No. 22-2166, 2022 WL 17839822, at *1 (3d Cir. Nov. 10, 2022) (citing *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998)); *see also Downer v. Warren*, No. 11-6414, 2013

---

[1] Petitioner did not raise anything related to this claim in his PCR proceedings.

WL 1986395, at *20 (D.N.J. May 13, 2013) (citations omitted) (noting habeas review addresses only claims attacking convictions, not matters collateral to those convictions). Furthermore, this Court has already analyzed Petitioner's claims related to trial counsel's purported ineffectiveness for failing to call either Mr. Darryl Smith or Mr. Roberts to testify at trial and found both claims do not warrant granting federal habeas relief. Thus, Claim 4 is denied.

## V.    CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, this Court finds that a certificate of appealability shall not issue in this case.

## VI.    CONCLUSION

For the foregoing reasons, Petitioner's habeas petition is denied. A certificate of appealability shall not issue. An appropriate Order will be entered.

DATED: November 27, 2023

GEORGETTE CASTNER
United States District Judge